NORMAND JOSEF ENTERPRISES, INC. *v.*
CONNECTICUT NATIONAL BANK
(14901)

PETERS, C. J., CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued May 3—decision released August 2, 1994

*Gerald L. Garlick,* for the appellant-appellee (defendant).

*Raymond J. Antonacci,* with whom were *Robert Hanahan* and, on the brief, *Robert Boynton,* for the appellee-appellant (plaintiff).

*Robert M. Langer,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Neil G. Fishman* and *William M.*

*Rubenstein,* assistant attorneys general, for the state of Connecticut as amicus curiae.

*Mark V. Connolly* and *David J. Wiese* filed a brief for the Connecticut Bankers Association as amicus curiae.

PETERS, C. J. The principal issue in this case is the relationship between a bank's common law right of setoff and a judgment creditor's statutory right to enforce a court-issued execution. The plaintiff, Normand Josef Enterprises, Inc. (Josef), filed a four count complaint against the defendant, Connecticut National Bank (bank), alleging, in separate counts, that the bank had wrongfully dishonored two orders of execution on the bank account of Josef's judgment debtor, J.H. Hogan, Inc. (Hogan), that the bank's wrongful conduct violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; and that the bank had falsely, fraudulently, intentionally and recklessly misrepresented to Josef that no funds were in the account in question. The trial court, *Pellegrino, J.,* rendered judgment in Josef's favor on the first three counts,[1] and awarded it attorney's fees for the CUTPA violation. The bank appealed to the Appellate Court

---

[1] Although the trial court's judgment and the memorandum of decision do not state an explicit finding for the bank on count four, the misrepresentation count, a close reading of the memorandum of decision reveals that the trial court considered and implicitly disposed of the fourth count in the bank's favor. In its discussion of count three, the alleged CUTPA violation, the trial court determined that the bank's response to Josef's execution was "deceptive and came *close to a misrepresentation.*" (Emphasis added.) In concluding the memorandum of decision, the court stated that "[j]udgment shall enter for the plaintiff as against the defendant on *counts one, two and three of the complaint only* . . . ." (Emphasis added.)

Although it is preferable for a trial court to make a formal ruling on each count, we will not elevate form over substance when it is apparent from the memorandum of decision that the trial court did not find that a misrepresentation had been made and that Josef did not prevail on the fourth count. We, thus, determine that the rights of the parties were concluded and a final judgment was rendered in this case. See *Clark* v. *Gibbs,* 184

from the judgment and the supplemental judgment, and Josef cross appealed from the denial by the trial court, *Pittman, J.,* of its postjudgment motion for attorney's fees to defend against the bank's appeal. We transferred the appeal and the cross appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

The trial court, *Pellegrino, J.,* made the following findings of fact. On September 24, 1991, Josef obtained a judgment against Hogan for $21,000. The validity of that judgment is not at issue. Because the judgment was not satisfied, Josef obtained an execution issued by the clerk of the court to recover unpaid damages in the amount of the judgment. Josef employed a deputy sheriff to serve the execution upon the bank in order to garnish the proceeds of Hogan's checking account. The deputy sheriff tried, unsuccessfully, on two occasions, to garnish this account.

The deputy sheriff first served the execution upon the bank on Friday, October 25, 1991. On that date, Hogan had a checking account balance at the bank in the amount of $5326.97. A check drawn to a third party on Hogan's account in the amount of $380.15 was honored and cleared the following Monday, October 28. Thereafter, however, relying on a default on Hogan's commercial loan from the bank, the bank set off $4945.82, the remainder of Hogan's account, to itself. Although the bank's "proof ticket" was dated October 28, indicating that the setoff occurred on that date, no commercial loan payment was entered in Hogan's account until October 29. The bank notified the deputy sheriff who had served the execution that, as of the date of the execution, no funds were available.

---

Conn. 410, 415 n.9, 439 A.2d 1060 (1981); *Howarth* v. *Northcott,* 152 Conn. 460, 462, 208 A.2d 540 (1965), overruled on other grounds, *Hao Thi Popp* v. *Lucas,* 182 Conn. 545, 438 A.2d 755 (1980); *Martin* v. *Martin's News Service, Inc.,* 9 Conn. App. 304, 306 n.2, 518 A.2d 951 (1986), cert. denied, 202 Conn. 807, 520 A.2d 1287 (1987).

Because of subsequent deposits, Hogan's bank account had a balance of $63,633.62, $54,620.06 and $51,673.23 on October 29, 30 and 31, respectively. The deputy sheriff served the execution for a second time on Wednesday, November 6, 1991, when Hogan's bank account had a balance of $31,304.86. Again relying on Hogan's defaulted bank loan, the bank repeated its exercise of its right of setoff, this time in the amount of $31,303.86. As had occurred previously, the bank manifested its exercise of that right by a "proof ticket" dated in timely fashion, on November 7, but did not credit the payment to Hogan's commercial loan account until the following day. The bank notified the deputy sheriff that no funds were available on the date of the second execution.

The trial court ruled in Josef's favor on the first two counts of its complaint, concluding that the bank had failed to act within the midnight deadline, the time constraint defined in General Statutes § 42a-4-104,[2] that is expressly made applicable to the garnishment of corporate bank accounts by the terms of General Statutes § 52-367a.[3] That time constraint would have required

[2] General Statutes § 42a-4-104 provides in relevant part: "DEFINITIONS AND INDEX OF DEFINITIONS. (a) In this article, unless the context otherwise requires . . . (10) 'midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later . . . ."

[3] General Statutes § 52-367a provides in relevant part: "EXECUTION AGAINST DEBTS DUE FROM BANKING INSTITUTION. DEBTOR OTHER THAN NATURAL PERSON. As used in this section and section 52-367b, the term 'banking institution' means a state bank and trust company, national banking association, savings bank, industrial bank, credit union, federal credit union, savings and loan association and federal savings and loan association. Execution may be granted pursuant to this section against any debts due from any banking institution to a judgment debtor which is not a natural person. If execution is desired against any such debt, the plaintiff requesting the execution shall so notify the clerk, and the clerk shall issue such execution containing a direction that the officer serving the same shall make demand (1) upon the main office of any banking institution having its main

the bank to exercise any right of setoff, in the first instance by midnight of October 28, and in the second instance by midnight of November 7. The court specifically found that the proof tickets were unreliable and that the bank had not exercised its setoff rights until October 29 and November 8.

With respect to these counts, the trial court also concluded that, regardless of its timing, the bank had no right of setoff in the circumstances of this case. The court determined that, in the absence of an express right of setoff in the Hogan loan agreement, the bank could only invoke a common law right of setoff. No common law right of setoff was available in this case, according to the trial court, because Hogan was not insolvent and because underlying equitable considerations did not support its recognition.

Finally, the trial court ruled in Josef's favor on its CUTPA claim. The court held that CUTPA applies to banks and that the bank's exercise of its right of setoff was, in both cases, a flagrant violation of § 52-367a and of the court orders of execution. The court found that the bank had engaged in deceptive conduct in return-

office within the county of such officer . . . for the payment of any debt due to the judgment debtor, and, after having made such demand, shall serve a true and attested copy thereof, with his actions thereon endorsed, with the banking institution officer upon whom such demand is made. If any such banking institution upon which such execution is served and upon which such demand is made is indebted to the judgment debtor, it shall pay to such officer, in the manner and at the time hereinafter described, the amount of such indebtedness not exceeding the amount due on such execution, to be received and applied on such execution by such officer. Such banking institution shall act upon such execution according to section 42a-4-303 before its midnight deadline, as defined in section 42a-4-104. If such banking institution fails or refuses to pay over to such officer the amount of such debt, not exceeding the amount due on such execution, such banking institution shall be liable in an action therefor to the judgment creditor named in such execution, and the amount so recovered by such judgment creditor shall be applied toward the payment of the amount due on such execution."

ing the orders of execution on the ground of "no available funds" without mentioning the setoffs. Accordingly, the court held that Josef was entitled not only to its money judgment and interest, but also to a reasonable attorney's fee. Thereafter, the court awarded attorney's fees calculated on an hourly basis.

On appeal, the bank challenges one of the trial court's findings of fact and all of its conclusions of law. As a matter of fact, the bank claims that its setoff was timely because it complied with the applicable midnight deadline. As a matter of law, the bank claims that: (1) Josef failed to state an actionable claim, because it alleged only that the bank did not act upon the execution according to General Statutes § 42a-4-303,[4] which does not apply to the circumstances of this case despite the cross-reference contained in § 52-367a; (2) the bank is entitled to a common law right of setoff in the circumstances of this case; (3) CUTPA does not apply to banks; (4) the bank did not violate CUTPA; and (5) the trial court miscalculated recoverable attorney's fees. The cross appeal filed by Josef challenges the trial court's ruling that, as a matter of law, CUTPA does not autho-

---

[4] General Statutes § 42a-4-303 provides in relevant part: "WHEN ITEMS SUBJECT TO NOTICE, STOP-PAYMENT ORDER, LEGAL PROCESS OR SET-OFF. ORDER IN WHICH ITEMS MAY BE CHARGED OR CERTIFIED. (a) Any knowledge, notice or stop-payment order received by, legal process served upon, or set-off exercised by a payor bank comes too late to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item if the knowledge, notice, stop-payment order, or legal process is received or served and a reasonable time for the bank to act thereon expires or the set-off is exercised after the earliest of the following . . . (4) the bank becomes accountable for the amount of the item under section 42a-4-302 dealing with the payor bank's responsibility for late return of items; or (5) with respect to checks, a cut-off hour no earlier than one hour after the opening of the next banking day after the banking day on which the bank received the check and no later than the close of that next banking day or, if no cut-off hour is fixed, the close of the next banking day after the banking day on which the bank received the check.

"(b) Subject to subsection (a), items may be accepted, paid, certified, or charged to the indicated account of its customer in any order."

rize recovery of anticipatory appellate attorney's fees. Although we affirm the judgment of the trial court concerning the § 52-367a violation and agree with its conclusion that CUTPA applies to banks, we disagree with the trial court's determination that the bank's actions, under the circumstances of this case, violated CUTPA.

## I

The bank first claims that Josef has failed to state an actionable claim and, therefore, cannot recover on the basis of its pleadings. The bank specifically contends that Josef only alleged a failure by the bank to act upon Josef's court-issued postjudgment execution, served pursuant to § 52-367a, in accordance with § 42a-4-303 before its midnight deadline as defined in § 42a-4-104. The bank argues that § 42a-4-303 provides rules for determining the priority between, inter alia, a setoff or judicial execution and an item, and not between an execution and a bank setoff. Because § 42a-4-303 does not apply to the circumstances of this case, which involve a priority dispute between Josef's judicial execution and the bank's setoff, the bank contends that the plaintiff cannot prevail on its cause of action.

## A

The first issue before us is whether § 42a-4-303, which is identical to § 4-303 of the Uniform Commercial Code, resolves a priority dispute between a judicial execution and a bank's setoff. The priority disputes that § 42a-4-303 addresses are those between an "item," on the one hand, and legal process such as a judicial execution or garnishment, a setoff by the payor bank, a bankruptcy petition or a stop payment order, on the other hand.[5] A.L.I., Uniform Commercial Code (12th

---

[5] These legal events include knowledge or notice of: (1) the depositor's death, incompetency or bankruptcy; (2) the depositor's stop payment order; (3) legal process on the depositor's account, i.e., garnishment or judicial execution; and (4) set-off by the payor bank. They are commonly referred

Ed. 1990) § 4-303 and comments 1 and 2. The term "item" is defined by § 42a-4-104 (a) (9) as "an instrument or a promise or order to pay money handled by a bank for collection or payment."[6] In order to come within § 42a-4-303, either the bank's setoff or Josef's postjudgment judicial execution would, therefore, have to be an "item." We agree with the bank that neither the setoff nor the execution order is an "item."

The right of setoff, although it may arise out of a written instrument, is a common law equitable right that is not itself a written instrument. A setoff involves "[t]he equitable right to cancel or offset mutual debts or cross demands, commonly used by a bank in reducing a customer's checking or other deposit account in satisfaction of a debt the customer owes the bank." Black's Law Dictionary (6th Ed. 1990) p. 1372; see *Sullivan* v. *Merchants National Bank,* 108 Conn. 497, 499–500, 144 A. 34 (1928). A setoff is, therefore, not an "item."

---

to as the "four legals." 1 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) § 18-7; A.L.I., Uniform Commercial Code (12th Ed. 1990) § 4-303, comment 3; B. Clark, The Law of Bank Deposits, Collections and Credit Cards (3d Ed. 1990) ¶ 5.04 [1]. For an analysis of § 4-303 of the Uniform Commercial Code, see 1 J. White & R. Summers, supra, § 18-7.

[6] The complete Uniform Commercial Code definition for an item is "an instrument or a promise or order to pay money handled by a bank for collection or payment. The term does not include a payment order governed by article 4A or a credit or debit card slip . . . ." General Statutes § 42a-4-104 (a) (9). These terms are further defined by the Uniform Commercial Code as follows: an " '[i]nstrument' means a negotiable instrument"; General Statutes § 42a-3-104 (b); a " 'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money . . . payable to bearer or to order . . . on demand or at a definite time . . . and . . . [d]oes not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money"; General Statutes § 42a-3-104 (a); a " '[p]romise' means a written undertaking to pay money signed by the person undertaking to pay"; General Statutes § 42a-3-103 (a) (9); and an " '[o]rder' means a written instruction to pay money signed by the person giving the instruction." General Statutes § 42a-3-103 (a) (6).

A postjudgment judicial execution or garnishment involves an order issued under authority of the court allowing a judgment creditor to obtain satisfaction of a judgment by reaching debts due from a third party, such as a banking institution, to the judgment debtor. General Statutes § 52-367a; *Hospital of St. Raphael* v. *New Haven Savings Bank,* 205 Conn. 604, 608, 534 A.2d 1189 (1987); see also 1 E. Stephenson, Connecticut Civil Procedure (2d Ed. 1970) § 56 (garnishment permits plaintiff to reach debts owed to defendant, personal property of defendant held by third parties and any benefits owed to defendant from deceased person's estate). A court-issued legal process, a judicial execution or garnishment is not "an instrument, order or promise" and, therefore, is not an "item."

Other courts that have considered priority disputes between a postjudgment judicial execution on a bank and a bank's right of setoff have similarly concluded that Uniform Commercial Code § 4-303 is not applicable to such a dispute. See, e.g., *Pittsburgh National Bank* v. *United States,* 657 F.2d 36, 39 (3d Cir. 1981); *Ebsary Foundation Co.* v. *Barnett Bank of South Florida, N.A.,* 569 So. 2d 806, 806–807 (Fla. App. 1990); *Victor Werlhof Aviation Ins.* v. *Garlick,* 237 Mont. 51, 771 P.2d 962, 967 (1989). Leading commentators on the Uniform Commercial Code have taken the same position. See B. Clark, The Law of Bank Deposits, Collections and Credit Cards (3d Ed. 1990) ¶ 5.04 [7] [c], p. 5-105, ¶ 14.05 [3], p. 14-17 and n.66, and (Cum. Sup. 1994) ¶ 5.04 [7] [a], p. S5-19; 1 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) § 18-7.

## B

Our determination that § 42a-4-303 does not apply in the circumstances of this case does not, however, end this matter. The question remains whether the alle-

gations in Josef's complaint encompass an actionable complaint that survives the inapplicability of § 42a-4-303. We disagree with the bank's contention that the complaint stands or falls with § 42a-4-303.

"It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of [its] complaint." (Internal quotation marks omitted.) *Lundberg* v. *Kovacs,* 172 Conn. 229, 232, 374 A.2d 201 (1977). However, "[t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Beaudoin* v. *Town Oil Co.,* 207 Conn. 575, 587–88, 542 A.2d 1124 (1988); *Fuessenich* v. *DiNardo,* 195 Conn. 144, 150–51, 487 A.2d 514 (1985). As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery. *Tedesco* v. *Stamford,* 215 Conn. 450, 459, 576 A.2d 1273 (1990), on remand, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992); *Giulletti* v. *Connecticut Ins. Placement Facility,* 205 Conn. 424, 434, 534 A.2d 213 (1987); see also *Web Press Services Corp.* v. *New London Motors, Inc.,* 203 Conn. 342, 359–60, 525 A.2d 57 (1987); see also Practice Book §§ 108 and 109.[7]

---

[7] Practice Book § 108 provides in pertinent part: "[GENERAL RULES OF PLEADING]——FACT PLEADING

"Each pleading shall contain a plain and concise statement of the material facts on which the pleader relies, but not of the evidence by which they are to be proved . . . . If any such pleading does not fully disclose the ground of claim . . . the court may order a fuller and more particular statement; and, if in the opinion of the court the pleadings do not sufficiently define the issues in dispute, it may direct the parties to prepare other issues, and such issues shall, if the parties differ, be settled by the court."

Practice Book § 109 provides in pertinent part: "[GENERAL RULES OF PLEADING]——PLEADING LEGAL EFFECT

"Acts . . . may be stated according to their legal effect, but in so doing the pleading should be such *as fairly to apprise the adverse party of the state of facts which it is intended to prove. . . .*" (Emphasis added.)

Furthermore, "a judgment ordinarily cures pleading defects . . . ." *Tedesco* v. *Stamford,* supra, 215 Conn. 458. "The absence of a requisite allegation in a complaint that would have justified the granting of a motion to strike, however, is not a sufficient basis for vacating a judgment unless the pleading defect has resulted in prejudice. [I]f parties will insist on going to trial on issues framed in a slovenly manner, they must abide the verdict; judgment will not be arrested for faults in statement when facts sufficient to support the judgment have been substantially put in issue and found. . . . Want of precision in alleging the cause of an injury for which an action is brought, is waived by contesting the case upon its merits without questioning such defect." (Citation omitted; internal quotation marks omitted.) Id., 457.

The bank would have us focus solely on paragraph ten of the first two counts of Josef's complaint, which alleges that "the defendant bank failed to act upon such execution according to § 42a-4-303 of the Connecticut General Statutes before its midnight deadline as defined in § 42a-4-104 (a) (10) of the Connecticut General Statutes." We decline to read the complaint so narrowly. The gravamen of the first two counts in Josef's complaint is that the bank improperly dishonored the judicial execution authorized by § 52-367a because the bank exercised its right of setoff in an untimely manner, namely, after the midnight deadline as defined in § 42a-4-104 (a) (10).[8] Indeed, the language in paragraph ten of the first two counts of Josef's complaint mirrors the language contained within § 52-367a, which specifies the manner in which the bank is required to act upon service of an execution.

---

[8] Paragraphs one, three, four, eight and nine, and the prayer for relief on the first two counts in Josef's complaint explicitly state that this action is brought pursuant to General Statutes § 52-367a, and that the bank violated that statute by exercising its right of setoff in an untimely fashion, after the midnight deadline had passed.

The procedural history of this case demonstrates that it was neither brought nor tried solely on the basis of § 42a-4-303. The bank never moved to strike either of the first two counts in the complaint, which focused on § 52-367a.[9] In addition, the issue regarding the allegations in Josef's complaint was raised and decided in favor of Josef in the trial court, as evidenced by the trial court's judgment for Josef on the first two counts, premised, in part, on the finding that the bank had "failed to act within the midnight deadline."[10] Notably, the trial court's memorandum of decision contains no mention of § 42a-4-303. Finally, at oral argument before us, the bank conceded that it was neither surprised nor prejudiced at trial that the issues in this case revolved around § 52-367a and the application of the midnight deadline.

For all of the foregoing reasons, we reject the bank's construction of Josef's complaint. We conclude that Josef raised an actionable claim regarding the bank's compliance with § 52-367a and that the bank had sufficient notice of this cause of action.

II

The bank next challenges the finding of the trial court that the setoff was untimely because it occurred after the midnight deadline. The bank's challenge is twofold. The first question the bank raises is whether, as a matter of law, the midnight deadline defined in § 42a-4-104 (a) (10) applies to the bank's exercise of its right of setoff in response to a service of execution under § 52-367a. The second question the bank raises

---

[9] The bank did unsuccessfully move to strike count three, the CUTPA claim, on the basis that CUTPA does not apply to banks.

[10] In its memorandum of decision, the trial court never mentioned, let alone based its decision on, General Statutes § 42a-4-303. The trial court, therefore, must have found that the allegations in the complaint were sufficient to place the bank on notice regarding the facts claimed and the issues to be tried.

is whether, assuming the applicability of the midnight deadline, the bank, as a matter of fact, exercised its right of setoff in timely fashion.[11]

## A

We must first determine the rules that govern the time within which a bank must act on a § 52-367a service of execution. The relevant portion of § 52-367a provides: "Such banking institution [served with an execution and upon which demand is made of any debts from such banking institution to a judgment debtor] shall act upon such execution according to section 42a-4-303 before its midnight deadline, as defined in section 42a-4-104." The bank maintains that, because § 42a-4-303 does not apply in the circumstances of this case, the midnight deadline is equally inapplicable. Josef maintains, to the contrary, that § 52-367a imposes the midnight deadline by its own terms even though § 42a-4-303 is inapplicable.

"We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Fahy* v. *Fahy*, 227 Conn. 505, 512, 630 A.2d 1328 (1993); *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 507–508, 636 A.2d 1342 (1994); *Lauer* v. *Zoning Commission*, 220 Conn. 455, 459–60,

---

[11] For the purposes of addressing these questions, we will assume that the bank had a right of setoff with respect to the account of Hogan, its judgment debtor.

600 A.2d 310 (1991); *Peck* v. *Jacquemin,* 196 Conn. 53, 63–66, 491 A.2d 1043 (1985).

The words of the statute are ambiguous. It is unclear whether the phrase "before its midnight deadline" modifies the phrase "according to section 42a-4-303" or "act upon such execution." The scant legislative history of § 52-367a is not specifically helpful.

In resolving this ambiguity, we must turn to the policy advanced by the statute. That policy is to afford judgment creditors an effective method for levying on the bank accounts of their judgment debtors. It is reasonable for us to effectuate this policy by assuming that the legislature intended "before its midnight deadline" to modify "act upon such execution."

If, as the bank urges, the midnight deadline is tied to the applicability of § 42a-4-303, then § 52-367a would contain no express time constraints within which a bank is required to act upon an execution when the competing priority involves not an "item," but another legal event such as a bank's right of setoff. The legislature has, however, at a minimum, manifested its intent that a bank should not have an unlimited time within which to respond to an execution.

First, in enacting § 52-367a the legislature explicitly referred to two Uniform Commercial Code provisions, §§ 42a-4-303 and 42a-4-104. By including these references, the legislature has made article four of the code the departure point for our analysis.

Second, article four of the Uniform Commercial Code governs bank deposits and collections and delineates the duties of a payor bank with regard to various commercial transactions, such as items and other legal events, including executions. See General Statutes § 42a-4-101 et seq. Under article four, these duties include the requirement of observance of the midnight deadline.

If § 52-367a does not incorporate the midnight deadline directly, the statute must be interpreted as requiring a bank to act within a reasonable time. Neither the text of the statute nor its obvious purpose of protecting the rights of a judicial lien creditor suggests that a bank has an unlimited amount of time in which to act upon an execution pursuant to § 52-367a. The reasonable time requirement, in turn, is informed, by analogy, by the provisions of article four. We have often drawn upon provisions of the Uniform Commercial Code as a source of analogy for the emergent common law. See, e.g., *New England Savings Bank* v. *Lopez,* 227 Conn. 270, 281–82, 630 A.2d 1010 (1993) (real property); *Hospital of St. Raphael* v. *New Haven Savings Bank,* supra, 205 Conn. 610–11 (passbook savings account); *Barco Auto Leasing Corp.* v. *House,* 202 Conn. 106, 114, 520 A.2d 162 (1987) (automobile leasing agreement); *New England Yacht Sales, Inc.* v. *Commissioner of Revenue Services,* 198 Conn. 624, 630, 504 A.2d 506 (1986) (transfer of title of personal property); *Olean* v. *Treglia,* 190 Conn. 756, 762, 463 A.2d 242 (1983) (real property); *Conference Center Ltd.* v. *TRC,* 189 Conn. 212, 225, 455 A.2d 857 (1983) (real property).

"We proceed, therefore, to a more fundamental principle of adjudication. Just as the legislature is presumed to enact legislation that renders the body of the law coherent and consistent, rather than contradictory and inconsistent . . . courts must discharge their responsibility, in case by case adjudication, to assure that the body of the law—both common and statutory—remains coherent and consistent." (Citation omitted.) *Fahy* v. *Fahy,* supra, 227 Conn. 513–14. "Statutes are now central to the law in the courts, and judicial lawmaking must take statutes into account virtually all of the time. . . . More often, the issue is rather to what extent a statute is itself a source of policy for consistent common law development." E. Peters, "Common

Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 998 (1982).

Looking to the Uniform Commercial Code by way of analogy in this case, we are persuaded that the midnight deadline contained in article four is an appropriate definition of a reasonable time for a bank to act in response to a service of an execution under § 52-367a. The code was drafted to simplify, clarify, modernize and unify the law of commercial transactions. General Statutes § 42a-1-102 (2). In order to achieve certainty and predictability in commercial dealings, "the drafters of the Code found it necessary to engage in line drawing"; *Citizens & Peoples National Bank of Pensacola* v. *United States,* 570 F.2d 1279, 1283–84 (5th Cir. 1978); such as by creating deadlines by which commercial actors were required to act upon certain events. Article four of the Uniform Commercial Code states the "principal rules of the bank collection process." A.L.I., Uniform Commercial Code (12th Ed. 1990) § 4-101, comment 1. The code establishes the midnight deadline[12] as the standard time frame within which a payor bank[13] must pay an item. General Statutes §§ 42a-4-301 and 42a-4-302.[14]

---

[12] For the definition of "midnight deadline," see footnote 2.

[13] " 'Payor bank' means a bank that is the drawee of a draft . . . ." General Statutes § 42a-4-105 (3). For the definition of "draft," see § 42a-4-104 (a) (7).

[14] See also General Statutes § 42a-4-303 (incorporating General Statutes § 42a-4-302 into its provisions regarding acting upon an item); General Statutes § 42a-4-202 (b) (specifying midnight deadline as general standard for timely action by collecting bank); General Statutes § 42a-4-213 (c) (specifying midnight deadline as default rule for final settlement of cashier's or teller's check that has not been presented or forwarded for collection); General Statutes § 42a-4-214 (a) (midnight deadline used as usual time frame to determine collecting bank liability for item after settlement has been revoked and where neither item has been returned nor notification sent).

The midnight deadline serves as a safe harbor provision for a payor bank because it does not become accountable for the amount of an item until

We therefore conclude that § 52-367a imposes a midnight deadline on a bank served with an execution. The midnight deadline arguably was intended by the legislature to apply directly even in transactions not governed by § 42a-4-303. Alternatively, if § 52-367a has no express time limitation for transactions that are not governed by § 42a-4-303, the bank must act within a reasonable time, and that reasonable time period is, by analogy, defined as the midnight deadline that is the baseline generally for article four provisions governing payouts by banks.

## B

Having determined that the midnight deadline, as defined in § 42a-4-104 (a) (10), is the applicable time limitation within which a bank must act upon a § 52-367a execution, the trial court appropriately concluded that the bank was required to exercise its competing right to a setoff before the expiration of that deadline. The bank maintains that the trial court improperly found that the bank had not taken definitive steps to manifest its exercise of a setoff within that prescribed time period. To the contrary, we agree with the trial court's finding.

On appeal, this court may reverse or modify the decision of the trial court only "if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record." Practice Book § 4061.[15] "We do not examine the record to deter-

after the midnight deadline has passed, unless, before that deadline has passed, it already has made final payment pursuant to General Statutes § 42a-4-215.

[15] Practice Book § 4061 provides: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"If the court deems it necessary to the proper disposition of the cause,

mine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) *Lukas* v. *New Haven,* 184 Conn. 205, 208, 439 A.2d 949 (1981); *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 88, 612 A.2d 1130 (1992); *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* 207 Conn. 468, 473, 542 A.2d 692 (1988). " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Doyle* v. *Kulesza,* 197 Conn. 101, 105, 495 A.2d 1074 (1985), quoting *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948); see also *Web Press Services Corp.* v. *New London Motors, Inc.,* 205 Conn. 479, 483, 533 A.2d 1211 (1987).

1

For our assessment of the trial court's finding of fact, we must first determine what steps a bank is required to take in order to effectuate a setoff. Although we have not previously addressed this specific question, we are persuaded that the bank must produce evidence of the time when it took some positive act manifesting that a setoff was actually made. This is the rule enunciated by the leading case of *Baker* v. *National City Bank of Cleveland,* 511 F.2d 1016 (6th Cir. 1975) (applying Ohio law).[16] That court held that "the act of setoff is not com-

it may remand the case for a further articulation of the basis of the trial court's factual findings or decision.

"It is the responsibility of the appellant to provide an adequate record for review."

[16] Although *Baker* v. *National City Bank of Cleveland,* supra, 511 F.2d 1016, involved a Uniform Commercial Code § 4-303 competition between

plete until three steps have been taken: (1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences that the right of setoff has been exercised." Id., 1018. The court quoted approvingly from an official comment to § 4-303 of the Uniform Commercial Code, which states that " '[i]n the case of setoff the effective time is when the setoff is actually made.' " Id.; A.L.I., Uniform Commercial Code (12th Ed. 1990) § 4-303, comment 5. On the basis of that comment, the court stated: "It is clear from this language that a setoff does not occur automatically each time a bank holds the matured debt of a depositor. The setoff must be 'actually made.' We do not hold that [Uniform Commercial Code § 4-303], standing alone, disposes of the issue in this case. However, it is a further sign which points to a policy of the State of Ohio, and of all states that have adopted the Uniform Commercial Code, which requires that *internal banking transactions involving adverse interests be evidenced by bookkeeping entries or some similarly binding overt act.* This policy not only provides criteria for determining conflicting claims, but also assures those who deal with banks that their rights will not be defeated by unsupported internal declarations of a self-serving nature." (Emphasis added.) *Baker* v. *National City Bank of Cleveland,* supra, 1018; see also *In re Saugus General Hospital, Inc.,* 698 F.2d 42, 47 (1st Cir. 1983); *United States* v. *Citizens & Southern National Bank,* 538 F.2d 1101, 1107 (5th Cir. 1976), cert. denied, 430 U.S. 945, 97 S. Ct. 1579, 51 L. Ed. 2d 792 (1977); *Victor Werlhof Aviation Ins.* v. *Garlick,* supra, 771 P.2d 965; *United Seeds, Inc.* v. *Eagle Green Corp.,* 223 Neb. 360, 363, 389 N.W.2d 571 (1986).

a bank's right of setoff and its depositor, triggered by a court order in bankruptcy proceedings enjoining setoff against the depositor's account, similar interests apply to the conflicting claims between a garnisher and the garnishee bank. The garnisher has the same rights as the underlying obligor at the time of garnishment. *Hospital of St. Raphael* v. *New Haven Savings Bank,* supra, 205 Conn. 614.

We therefore hold that as a matter of law, a bank effectuates its right of setoff only after it has performed some binding overt act and has made a record to evidence that action. See *Michigan Carpenters' Council Pension Fund* v. *Smith & Andrews Construction Co.,* 681 F. Sup. 1252, 1254–55 (E.D. Mich. 1988) (applying *Baker* test to determine if bank exercised right of setoff against competing garnishment of bank account). Furthermore, we hold that, consistent with the certainty and predictability required by banking operations in the commercial world, the act must be unequivocal, objectively ascertainable and final in order to be overt and binding. Cf. *Citizens & Peoples National Bank of Pensacola* v. *United States,* supra, 570 F.2d 1283.

2

We now address the bank's challenge to the validity of the trial court's finding that its effectuation of its right to a setoff was untimely, in light of the standard just articulated. In determining that the setoff had not been effectuated by the midnight deadline, the court stated that it "reject[ed] the self-serving testimony of the bank employees who testified that the proof tickets were sufficient to debit the account. The proof tickets, although prepared by the employees who testified, also have a box marked 'Approved by,' which were signed by [another] bank official who did not appear to testify. The court is not convinced that the proof slips were, in fact, approved on the day noted on the slips, since the statement records the setoff the following day after the midnight deadline in both instances. The court was offered no plausible explanation why the defendant bank could not have debited the Hogan account within the midnight deadline on the statement of their depositor Hogan if, in fact, this is what they intended to do. The court places more credence on the Hogan statement as to the date the account was debited than the statements of the defendant's employees who tes-

tified that the accounts were debited on the date they prepared the 'proof tickets.' " The bank has offered no persuasive argument why these findings of the trial court should be overturned.

"Judgments pertaining to the resolution of conflicting factual claims lie within the province of the trial court." *Edens* v. *Kole Construction Co.,* 188 Conn. 489, 495, 450 A.2d 1161 (1982). "It is familiar law that [it] was for the trial court to weigh the evidence and determine the credibility of the witnesses. This court cannot and will not weigh the evidence contained in the record before us. . . . If there is sufficient evidence in the record in support of the decision of the trial court such decision must be affirmed." (Citation omitted; internal quotation marks omitted.) *Cashman* v. *Calvo,* 196 Conn. 509, 513–14, 493 A.2d 891 (1985).

We cannot second-guess the trial court's assessment of the credibility of the witnesses produced by the bank. "It is the trial court which had an opportunity to observe the demeanor of the witnesses and parties; thus, it is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." *Kukanskis* v. *Jasut,* 169 Conn. 29, 32–33, 362 A.2d 898 (1975). "A trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible." (Citations omitted.) *Barrila* v. *Blake,* 190 Conn. 631, 639, 461 A.2d 1375 (1983).

Our review of the record discloses no basis for disturbing the trial court's findings of fact. We conclude, therefore, that the trial court properly determined that, after having been served with Josef's execution, the bank failed to effectuate its right of setoff within the applicable midnight deadline as required by § 52-367a. Accordingly, we affirm the judgment of the trial court

that the bank violated § 52-367a as alleged in counts one and two of Josef's complaint.[17]

### III

The bank next claims that the trial court improperly concluded that it had violated CUTPA. Again, this challenge is twofold. First, the bank contends that CUTPA does not apply to banks. Second, the bank argues that even if banks are, in principle, subject to CUTPA, its actions in this case after having been served with Josef's § 52-367a execution did not amount to a CUTPA violation.

### A

The bank first argues that the trial court improperly determined that CUTPA applies to banks. The bank emphasizes that the legislature has instructed the courts and the commissioner of consumer protection to look to the Federal Trade Commission Act for guidance in the interpretation of CUTPA. General Statutes § 42-110b (b);[18] *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 178–79, 510 A.2d 972 (1986). Because § 5 (a) (2) of the Federal Trade Commission Act specifically exempts banks from its coverage,[19] the bank

[17] Because we agree with the trial court's finding that the bank did not exercise its right of setoff before the midnight deadline and, thus, did not act upon the execution in a timely manner, we need not decide whether the trial court correctly determined that the bank was not entitled to a common law right of setoff in the circumstances of this case.

[18] General Statutes § 42-110b (b) provides: "It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)), as from time to time amended."

[19] Title 15 of the United States Code, § 45 (a) (2) (1988) provides: "The [Federal Trade] Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a (f) (3) of this title, Federal credit unions described in section 57a (f) (4) of this title, common carriers subject to the

maintains that we should similarly construe CUTPA as being inapplicable to banks. Furthermore, because banks are regulated by state authorities and by federal authorities other than the Federal Trade Commission, the bank argues that this pattern of pervasive regulation is analogous to the regulation of the securities industry, which we held to be exempt from CUTPA in *Russell* v. *Dean Witter Reynolds, Inc.*, supra, 172. We disagree with the bank's arguments and hold that CUTPA does apply to banks.

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). Our starting point in interpreting the scope of CUTPA is § 42-110b (d), which provides that "[i]t is the intention of the legislature that this chapter be remedial and be so construed." See *Web Press Services Corp.* v. *New London Motors, Inc.*, supra, 203 Conn. 354; *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 520, 461 A.2d 938 (1983); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981). Furthermore, a party claiming an exemption from CUTPA has the burden of proof. General Statutes § 42-110c (b).

On their face, the definitional sections of CUTPA include banks. A bank is a "person," as defined in § 42-110a (3),[20] and is engaged in the conduct of

Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958 [49 U.S.C. § 1301 et seq.], and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. § 181 et seq.], except as provided in section 406 (b) of said Act [7 U.S.C. § 227 (b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."

[20] "Person" is defined at General Statutes § 42-110a (3) as "a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity . . . ."

"trade" or "commerce," as defined in § 42-110a (4).[21] Unless the bank can establish some extrinsic ground of exemption, its conduct with respect to a judicial execution under § 52-367a is, therefore, an act or practice that comes within the regulatory ambit of CUTPA.

Furthermore, CUTPA expressly provides exceptions from its coverage that exclude a variety of commercial transactions but do not provide a blanket exemption for banks. General Statutes § 42-110c.[22] We have repeatedly observed that courts should not interpret legislation to enlarge existing statutory exemptions. *State* v. *Turello,* 183 Conn. 330, 335, 439 A.2d 364 (1981); see also *Caulkins* v. *Petrillo,* 200 Conn. 713, 718–20, 513 A.2d 43 (1986); *Downer* v. *Liquor Control Commission,* 134 Conn. 555, 560, 59 A.2d 290 (1948).

The fact that banks are exempt from the Federal Trade Commission Act does not establish their exemption from CUTPA. Read precisely, § 42-110b (b) urges us to be guided only by "Section 5 (a) (1) of the Federal Trade Commission Act . . . ." Banks, however, derive their federal exemption from § 5 (a) (2) of the

[21] " 'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

[22] General Statutes § 42-110c provides: "EXCEPTIONS. (a) Nothing in this [Unfair Trade Practices] chapter shall apply to: (1) Transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States; or (2) acts done by the publisher, owner, agent or employee of a newspaper, periodical or radio or television station in the publication or dissemination of an advertisement, where the publisher, owner, agent or employee did not have knowledge of the false, misleading, unfair or deceptive character of the advertisement, and did not have direct financial interest in the sale or distribution of the advertised product or service.

"(b) The burden of proving exemption, as provided in this section, from the provisions of this chapter shall be upon the person claiming the exemption."

Federal Trade Commission Act. See footnote 19. It is entirely logical that our legislature would have referred to § 5 (a) (1), rather than to the Federal Trade Commission Act in its entirety, because § 5 (a) (1) is the source of the substantive standards that the Federal Trade Commission has established to regulate unfair trade practices.[23]

It would be inconsistent with the remedial purposes of CUTPA for us to broaden the reference in § 42-110b (b) to § 5 (a) (1) of the Federal Trade Commission Act to incorporate the blanket exemption for banks that is contained in § 5 (a) (2) of the federal act. "The General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them. And it is always presumed to have intended that effect which its action or non-action produces." (Internal quotation marks omitted.) *Plourde* v. *Liburdi,* 207 Conn. 412, 417, 540 A.2d 1054 (1988). This presumption includes knowledge, not only of existing Connecticut statutes, but also of all federal statutes, including the Federal Trade Commission Act. Since CUTPA includes its own

---

[23] Furthermore, we have construed General Statutes § 42-110b as a source of guidance for Connecticut courts, rather than as a mandate by which our courts are bound. "[A]lthough § 42-110b (b) provides that courts and the [commissioner of consumer protection] shall be *guided by* the federal interpretations given § 5 of the Federal Trade Commission Act, they are not limited by such interpretations. 'As originally enacted, [CUTPA] provided that state unfair or deceptive acts or practices were to be those *"determined to be"* unfair or deceptive by the [Federal Trade Commission] or the federal courts. 1973 Pub. Acts 615, § 2 (a). However, the Act was amended in 1976 to provide only that courts in Connecticut [and the . . . commissioner of consumer protection] were to be "guided by" federal interpretations of § 5 of the [Federal Trade Commission Act]. The purpose of the change apparently was to permit . . . practices which had not yet been specifically declared unlawful by federal authorities to be nevertheless unlawful under CUTPA.' (Emphasis added.) *Bailey Employment System, Inc.* v. *Hahn,* 545 F. Sup. 62, 71 (D. Conn. 1982)." *Caldor, Inc.* v. *Heslin,* 215 Conn. 590, 598, 577 A.2d 1009 (1990), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991).

exemption section, § 42-110c, it is plain that the legislature recognized that some limitations on the scope of CUTPA were desirable. Had it wanted to include banks within those limitations, it knew how to do so. See *Federal Aviation Administration* v. *Administrator,* 196 Conn. 546, 551, 494 A.2d 564 (1985); *State* v. *Smith,* 194 Conn. 213, 223, 479 A.2d 814 (1984); *Edmundson* v. *Rivera,* 169 Conn. 630, 635, 363 A.2d 1031 (1975). Courts should not create exemptions that the legislature has not enacted.

The bank argues, however, that the banking industry is entitled to an implied exemption from CUTPA by analogy to the implied exemption of the securities industry that this court recognized in *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 172, despite the absence of an express exemption in CUTPA for securities transactions. In *Russell,* we framed the question of applicability as "not whether [the suspect] transactions are exempt from CUTPA but whether CUTPA itself can fairly be interpreted to encompass such transactions in the first instance." Id., 178. In determining that securities transactions were not subject to CUTPA, we engaged in a four part analysis. That analysis was refined and applied in *Mead* v. *Burns,* 199 Conn. 651, 661–63, 509 A.2d 11 (1986), and *Connelly* v. *Housing Authority,* 213 Conn. 354, 361–64, 567 A.2d 1212 (1990). To determine whether the suspect transactions should be exempt from CUTPA, we examine: (1) the applicability of Federal Trade Commission rules to the suspect conduct and the absence of any Federal Trade Commission regulatory activity over industry practices; (2) the existence and scope of an alternate comprehensive regulatory scheme or system; (3) the absence of any activity by the commissioner of consumer protection within this area; and (4) the case law of other jurisdictions. *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 179–84. Applying this four part analysis

to the bank's activities in this case, we conclude that banks are not exempt from CUTPA coverage.

The first part of this analysis asks whether the Federal Trade Commission regulates the banking industry, directly or indirectly. Although banks are not directly subject to the Federal Trade Commission; 15 U.S.C. § 45 (a) (2) (1988); *United States* v. *Philadelphia National Bank,* 374 U.S. 321, 336 and n.11, 83 S. Ct. 1715, 10 L. Ed. 2d 915 (1963);[24] the banking industry, unlike the securities industry, is affected by Federal Trade Commission rules and regulations. The Federal Trade Commission has the authority to promulgate rules, regulations and policy guidelines that define unfair or deceptive practices and that significantly impact the conduct of banks. See 15 U.S.C. § 57a (a) and (f) (1988).[25] Once the Federal Trade Commission

---

[24] The legislative history of the 1974 amendments to the Federal Trade Commission Improvement Act; Pub. L. No. 93-637; states: "Under the Federal Trade Commission Act the Commission does not have authority to regulate banks. This legislation does nothing to change this situation." H.R. Rep. No. 1107, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 7702, 7729; see also H.R. Rep. No. 265, 95th Cong., 1st Sess. 2–3 (1979), reprinted in 1979 U.S.C.C.A.N. 372, 372–73 ("In 1914 when the Federal Trade Commission Act was enacted, banks were specifically exempted from the regulatory and investigative authorities of the newly-created Commission because they were subject to Federal regulatory control by the Federal Reserve Board.").

[25] Title 15 of the United States Code, § 57a (a) (1988) provides in pertinent part: "AUTHORITY OF COMMISSION TO PRESCRIBE RULES AND GENERAL STATEMENTS OF POLICY (1) . . . [T]he Commission may prescribe . . . (B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45 (a) (1) of this title), except that the Commission shall not develop or promulgate any trade rule or regulation with regard to the regulation of the development and utilization of the standards and certification activities pursuant to this section. Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices."

Title 15 of the United States Code, § 57a (f) (1988) provides in pertinent part: "UNFAIR OR DECEPTIVE ACTS OR PRACTICES BY BANKS, SAVINGS AND LOAN INSTITUTIONS, OR FEDERAL CREDIT UNIONS; PROMULGATION OF REGU-

has promulgated a rule, bank boards, which have enforcement authority over banks in order to prevent unfair and deceptive practices, have sixty days to promulgate a substantially similar regulation. Such parallel regulations are required unless the appropriate board finds that the acts or practices are not unfair or deceptive, or the Board of Governors of the Federal Reserve System finds that implementation of similar regulations with respect to banks would "seriously con-

LATIONS BY BOARD OF GOVERNORS OF FEDERAL RESERVE SYSTEM, FEDERAL HOME LOAN BANK BOARD, AND NATIONAL CREDIT UNION ADMINISTRATION BOARD; AGENCY ENFORCEMENT AND COMPLIANCE PROCEEDINGS; VIOLATIONS; POWER OF OTHER FEDERAL AGENCIES UNAFFECTED; REPORTING REQUIREMENTS (1) In order to prevent unfair or deceptive acts or practices in or affecting commerce (including acts or practices which are unfair or deceptive to consumers) by banks or savings and loan institutions described in paragraph (3), each agency specified in paragraph (2) or (3) of this subsection shall establish a separate division of consumer affairs which shall receive and take appropriate action upon complaints with respect to such acts or practices by banks or savings and loan institutions described in paragraph (3) subject to its jurisdiction. The Board of Governors of the Federal Reserve System (with respect to banks) and the Federal Home Loan Bank Board (with respect to savings and loan institutions described in paragraph (3)) and the National Credit Union Administration Board (with respect to Federal credit unions described in paragraph (4)) shall prescribe regulations to carry out the purposes of this section, including regulations defining with specificity such unfair or deceptive acts or practices, and containing requirements prescribed for the purpose of preventing such acts or practices. Whenever the [Federal Trade] Commission prescribes a rule under subsection (a) (1) (B) of this section, then within 60 days after such rule takes effect each such Board shall promulgate substantially similar regulations prohibiting acts or practices of banks or savings and loan institutions described in paragraph (3), or Federal credit unions described in paragraph (4), as the case may be, which are substantially similar to those prohibited by rules of the Commission and which impose substantially similar requirements, unless (A) any such Board finds that such acts or practices of banks or savings and loan institutions described in paragraph (3), or Federal credit unions described in paragraph (4), as the case may be, are not unfair or deceptive, or (B) the Board of Governors of the Federal Reserve System finds that implementation of similar regulations with respect to banks, savings and loan institutions or Federal credit unions would seriously conflict with essential monetary and payments systems policies of such Board, and publishes any such finding, and the reasons therefor, in the Federal Register."

flict with essential monetary and payments systems policies of [the Federal Reserve] Board . . . ." 15 U.S.C. § 57a (f) (1) (1988). Thus, although the Federal Trade Commission is not directly responsible for preventing unfair and deceptive acts or practices with respect to banks, it has been given the leadership role in defining what conduct constitutes unfair or deceptive acts or practices in that industry. In effect, the substance of any rule promulgated by the Federal Trade Commission applies to banks unless the banks have specifically been exempted under the two narrow exceptions provided in 15 U.S.C. § 57a (f) (1).

CUTPA's rule making scheme is similar. Once the commissioner of consumer protection promulgates a regulation pursuant to § 42-110b (c),[26] that regulation applies to the conduct of banks unless the commissioner of banking specifically permits such conduct, thereby making that conduct exempt from CUTPA's ambit as per § 42-110c (a) (1).

The Federal Trade Commission has in fact exercised its authority to promulgate rules and regulations with regard to unfair and deceptive acts or practices that affect the conduct of banks. Compare FTC Preservation of Consumers' Claims and Defenses Rule, 16 C.F.R. § 433 (1993) ("Holder in Due Course Rule" or "Seller Rule"), with Comptroller of the Currency, Banking Circular No. 68 [1973-1978 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 96,840 (May 14, 1976) (national banks are impacted by Federal Trade Commission's "holder in due course rule"), and Board of

[26] General Statutes § 42-110b (c) provides: "The commissioner may, in accordance with chapter 54, establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive in violation of subsection (a) of this section. Such regulations shall not be inconsistent with the rules, regulations and decisions of the federal trade commission and the federal courts in interpreting the provisions of the Federal Trade Commission Act."

Governors of the Federal Reserve System, Letter to Presidents of all Federal Reserve Banks (Bank Involvement in "Seller Rule" Letter) [1973-1978 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 96,848 (May 24, 1976) (same); compare also FTC Credit Practices Rule, 16 C.F.R. § 444 (1993), with Board of Governors of Federal Reserve System Unfair or Deceptive Acts or Practices Rule (Regulation AA), 12 C.F.R. § 227 (1993).

The relationship in law and in fact between the Federal Trade Commission and the banking industry therefore demonstrates a substantial amount of regulatory activity that affects the conduct of the banking industry. By contrast, the Federal Trade Commission has never undertaken to define deceptive practices in the sale and purchase of securities. *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 180.

The second part of our analysis requires us to determine whether banks are so comprehensively regulated by a different regime that CUTPA should not apply. In *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 180, we recognized that securities transactions were comprehensively regulated by the Securities and Exchange Commission. See Securities Act of 1933, 15 U.S.C. § 77a et seq., and Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. We also examined the Connecticut Uniform Securities Act (CUSA); General Statutes §§ 36-470 through 36-502; and its predecessor acts. We noted that these predecessor laws provided a private cause of action for security transaction violations well before CUTPA had been enacted; *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 181–82; and that CUSA provided not only a private cause of action, but also all of the same remedies that one could obtain by bringing an action under CUTPA, except for punitive damages. Id., 175–76.[27] We thus determined that the

---

[27] In *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 175–76, we determined that both CUSA and CUTPA allow a private party to recover

existence and scope of a comprehensive regulatory regime under both federal and state law precluded application of CUTPA to securities transactions. Id., 180–84.[28]

While banks are arguably comprehensively regulated under federal law,[29] even national banks, which are instrumentalities of the federal government, have always been subject to the laws of the state in which they do business. State laws are preempted only when their operation expressly conflicts with the laws of the United States. *McClellan* v. *Chipman,* 164 U.S. 347, 356–57, 17 S. Ct. 85, 41 L. Ed. 461 (1896); *Shea* v. *First Federal Savings & Loan Assn. of New Haven,* 184 Conn. 285, 292–93, 439 A.2d 997 (1981). No claim of preemption has been made in this case.

Banks are not so comprehensively regulated under state law[30] as to be exempt from CUTPA. The bank has failed to point to and we have been unable to find any statute or regulation that encompasses the same

restitutionary damages, interest and attorney's fees. Compare General Statutes § 36-498 (buyer's remedies under CUSA) with General Statutes § 42-110g (remedies under CUTPA).

[28] Implicit in our decision in *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 175–76, that CUTPA does not apply to securities transactions was the determination that the availability of a punitive damage award in an action under CUTPA, as opposed to CUSA, was insignificant.

[29] National banks, including federal savings and loans and credit unions, are primarily regulated under Title 12 of the United States Code. They are subject to a myriad of regulatory agencies including, but not limited to, the Comptroller of the Currency, the Federal Reserve System, the Federal Deposit Insurance Corporation, the Federal Home Loan Bank Board and the National Credit Union Administration Board. For an overview of banking regulation, see C. Lichtenstein, "Regulation of Banking Organizations under the United States Federal System (the 'Dual Banking System')," in Institute of Banking Law and Regulation 1990 (Practising Law Institute 1990) pp. 11–25; T. Levine, "The Dual Banking System," in Institute of Banking Law and Regulation 1990 (Practising Law Institute 1990) pp. 27–42.

[30] Banks are primarily regulated under Title 36 of the General Statutes, entitled "The Banking Law of Connecticut," §§ 36-1 through 36-583, and by the commissioner of banking.

type and scope of unfair trade practices that are proscribed by CUTPA. More specifically, we have been unable to find any statute or regulation that regulates a bank's duties with regard to its right to set off an account when dealing with others, such as garnishers, who have a direct adverse interest in that same account. Unlike *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 172, in which we determined that CUTPA was redundant in light of the pervasive remedial provisions for securities transactions contained in CUSA, we have been unable to locate a comparable remedial scheme within this state's banking regulatory framework.

The mere existence of generic state and federal banking regulations does not exclude CUTPA coverage. CUTPA is applicable even when its regulatory scheme overlaps that authorized by another statute or regulation. *Mead* v. *Burns,* supra, 199 Conn. 662–63; see also *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo,* supra, 190 Conn. 510; *Perdue* v. *Crocker National Bank,* 38 Cal. 3d 913, 702 P.2d 503, 216 Cal. Rptr. 345 (1985), appeal dismissed, 475 U.S. 1001, 106 S. Ct. 1170, 89 L. Ed. 2d 290 (1986). CUTPA recognizes the possibility of overlap in its provision that expressly exempts transactions within its ambit only when such transactions or actions are "otherwise *permitted* under law as administered by any regulatory [regime] acting under statutory authority of the state or of the United States." (Emphasis added.) General Statutes § 42-110c (a) (1). In *Connelly* v. *Housing Authority,* supra, 213 Conn. 361, we held that the actions of a municipal housing authority in leasing and renting apartments were exempt from CUTPA scrutiny because such actions were "*expressly authorized* and pervasively regulated by both the state department of housing and [the United States Department of Housing and Urban Development]." (Emphasis added.) No

banking regulation of which we are aware expressly authorizes a bank to delay its response to a judicial execution under § 52-367a.

In the third part of this analysis, we consider whether the commissioner of consumer protection, the state administrator responsible for enforcing CUTPA, has undertaken regulatory activities with respect to the subject area. In *Russell* v. *Dean Witter Reynolds, Inc.*, supra, 200 Conn. 182, we determined that the commissioner of consumer protection had never purported to regulate the conduct of securities transactions. By contrast, the commissioner of consumer protection has invoked CUTPA authority to compel Connecticut banks to comply with an investigative demand for information about real estate lending practices within the banking industry. *Heslin* v. *Liberty Bank for Savings*, 1977-1 Trade Cases (CCH) ¶ 61,311 (Conn. Common Pleas 1977). In 1986, the attorney general, at the request of the commissioner of consumer protection, brought a CUTPA action against, among others, thirty-five banks for involvement in home improvement financing irregularities. See amended complaint, *State* v. *The Dartmouth Plan, Inc.*, United States District Court for the District of Connecticut, Docket No. H 86-627 (dated March 10, 1987).[31]

Finally, the last part of this analysis consists of an inquiry into the case law of other jurisdictions. Although not unanimous, most state courts have determined that banks are subject to the provisions of their state's unfair or deceptive trade practices or consumer

---

[31] This case was settled in 1988 and included the dismissal of all claims against the banks with prejudice. See final judgment 33, *State* v. *The Dartmouth Plan, Inc.*, supra (March 17, 1988). The state of Connecticut, as amicus curiae in this appeal, also represented to us in its brief and at oral argument that the commissioner of consumer protection has worked with the commissioner of banking for a number of years to remedy consumer protection problems that implicate banking industry practices.

protection statutes.[32] See, e.g., *Heastie* v. *Community Bank of Greater Peoria,* 727 F. Sup. 1133 (N.D. Ill. 1989) (applying Illinois consumer fraud statute); *Perdue* v. *Crocker National Bank,* supra, 38 Cal. 3d 913; *Fletcher* v. *Security Pacific National Bank,* 23 Cal. 3d 442, 591 P.2d 51, 153 Cal. Rptr. 28 (1979); *First National Bank of Anthony* v. *Dunning,* 18 Kan. App. 2d 518, 855 P.2d 493 (1993); *Raymer* v. *Bay State National Bank,* 384 Mass. 310, 424 N.E.2d 515 (1981); *Attorney General* v. *Michigan National Bank,* 110 Mich. App. 106, 312 N.W.2d 405 (1981), rev'd in part, 414 Mich. 948, 325 N.W.2d 777 (1982); *Baird* v. *Norwest Bank,* 255 Mont. 317, 843 P.2d 327 (1992); *Ashlock* v. *Sunwest Bank of Roswell, N.A.,* 107 N.M. 100, 753 P.2d 346 (1988); *Pennsylvania Bankers Assn.* v. *Commonwealth,* 58 Pa. Commw. 170, 427 A.2d 730 (1981); *Vogt* v. *Seattle-First National Bank,* 117 Wash. 2d 541, 817 P.2d 1364 (1991). Two of the four state courts that have ruled to the contrary relied on explicit statutory exemptions for banks. See *Preferred Investment Corp.* v. *Neucere,* 592 So. 2d 889 (La. App. 1991), cert. denied, 597 So. 2d 1028 (La. 1992); *First Financial Bank* v. *Butler,* 492 So. 2d 503 (La. App. 1986); *Little* v. *Gillette,* 218 Neb. 271, 354 N.W.2d 147 (1984). The remaining minority of courts either incorporated the exemption in the Federal Trade Commission Act; *Idaho First National Bank* v. *Wells,* 100 Idaho 256, 596 P.2d 429 (1979); or concluded that banks were sufficiently and pervasively regulated by other regulatory agencies. *NCNB National Bank of North Carolina* v. *Tiller,* 814 F.2d 931 (4th Cir. 1987) (applying South Carolina law); *Anderson* v. *Citizens Bank,* 294 S.C. 387, 365 S.E.2d 26 (1987), overruled in part by *Ward* v. *Dick Dyer & Associates, Inc.,* 304 S.C. 152, 403 S.E.2d 310 (1991) (overruled to extent that *Anderson* was based on "general activity" test).

---

[32] Of course, we recognize that each state's statutory scheme, including the language of its provisions and its legislative history, may differ.

Our conclusion to apply CUTPA to banks is particularly bolstered by the fact that the Supreme Judicial Court of Massachusetts reached a similar conclusion; *Raymer* v. *Bay State National Bank,* supra, 384 Mass. 310; because the "governing statutes in Massachusetts are virtually identical to our own." *Russell* v. *Dean Witter Reynolds, Inc.,* supra, 200 Conn. 183. We have, therefore, repeatedly looked to the reasoning and decisions of the Supreme Judicial Court of Massachusetts with regard to the scope of CUTPA. Id.; *Mead* v. *Burns,* supra, 199 Conn. 663.

Applying this four part analysis to the circumstances of this case, we conclude that the banking industry, unlike the securities industry, is governed by CUTPA. In light of the text of CUTPA and our case law, the bank has failed to establish its right to a blanket exemption from CUTPA's regulation of unfair trade practices.

B

The bank's final claim is that the trial court, even if it properly concluded that CUTPA applies to banks, improperly concluded that the manner in which the bank responded to Josef's § 52-367a execution constituted a CUTPA violation. The trial court found that the bank had violated CUTPA by: (1) failing to comply with the provisions of § 52-367a after having been served with Josef's executions; and (2) sending notices that, without mentioning the setoffs, informed the sheriff that there were no available funds in the account. At oral argument in this court, however, Josef restated its CUTPA complaint as focusing not on the bank's intrinsic right of setoff, but on the bank's allegedly deceptive disclosures that there were insufficient funds in Hogan's account to satisfy the executions.[33] Our

---

[33] The third count of Josef's complaint alleged that the bank violated CUTPA through its misrepresentations, which included its response to the sheriff that there were no available funds in the judgment debtor's account

review of the trial court's determination of a CUTPA violation by the bank is, thus, limited to whether the bank's disclosures were deceptive and violated CUTPA.

"It is well settled that in determining whether [an act or] practice violates CUTPA we have 'adopted the criteria set out in the "cigarette rule" by the federal trade commission for determining when [an act or] practice is unfair: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]." *Conaway* v. *Prestia,* [191 Conn. 484, 492–93, 464 A.2d 847 (1983)], quoting *FTC* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972) . . . .' *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* 192 Conn. 558, 567–68, 473 A.2d 1185 (1984).

" 'All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 Fed. Reg. 59,614, [and] 59,635 (1978).' (Internal quotation marks omitted.) Id., 569 n.15. 'Thus a violation of CUTPA may be established by showing either an actual deceptive practice; see, e.g., *Sprayfoam, Inc.* v. *Durant's Rental Centers, Inc.,* 39 Conn. Sup. 78, 468 A.2d 951 (1983);

---

to satisfy the judgment creditor's execution and the fact that this response was in direct variance and contradiction to the bank statements of the judgment debtor's account.

or a practice amounting to a violation of public policy. See, e.g., *Sportmen's Boating Corporation* v. *Hensley,* [192 Conn. 747, 474 A.2d 780 (1984)].' *Web Press Services Corporation* v. *New London Motors, Inc.,* [supra, 203 Conn. 355]. Furthermore, a party need not prove an intent to deceive to prevail under CUTPA. See id., 363 (knowledge of falsity, either constructive or actual, need not be proven to establish CUTPA violation)." *Cheshire Mortgage Service, Inc.* v. *Montes,* supra, 223 Conn. 105–106.

The trial court found that both of the bank's notifications to the sheriff who had served the bank with Josef's execution were deceptive and constituted CUTPA violations. The trial court focused on the fact that the bank's notices stated that there were "no available funds" and did not mention the bank's setoffs. The trial court stated: "This response . . . was deceptive and came close to a misrepresentation. The actions of the [bank] in this case were unfair, illegal, they offended public policy and above all, they were an affront to this court." We disagree with the trial court's findings and conclude that the bank's notifications did not violate CUTPA.

We note, at the outset, that our review of the trial court's determination is hampered by the ambiguity of the trial court's finding that each of the bank's responses "came close to a misrepresentation." We will assume that the trial court's characterization reflects its finding that, while accurate on their face, the notices were misleading because of their failure to disclose that it was the bank's exercise of its right of setoff that led to the unavailability of funds for Josef, the executing judgment creditor.

A failure to disclose can be deceptive only if, in light of all the circumstances, there is a duty to disclose. Josef has pointed to no authority that would support

the conclusion that a bank served with an execution has a duty to disclose anything more than that the garnished funds are not available. A bank account may be depleted by any number of competing claimants. If the bank, after having been served with an execution, had properly honored competing checks written on the judgment debtor's account; General Statutes § 42a-4-303; and the honoring of those checks had left the account with insufficient funds to pay the judgment creditor based on the execution, the bank would be required only to disclose that the funds in the account were insufficient and not the reason for the insufficiency. We see no reason to differentiate, for notice purposes, between a bank's right of setoff and the bank's honoring of any other competing claim, such as a check.

Although the bank had no duty to disclose, it acted improperly in failing to exercise its right of setoff in timely fashion as defined by the midnight deadline that, earlier in this opinion, we have held to govern § 52-367a executions. The bank's notices that the garnished accounts had no available funds were therefore inaccurate in this respect. The trial court did not, however, find that the bank, by giving notices that improperly assumed that the bank's setoffs had been timely, had intentionally or fraudulently created a false impression. Moreover, the trial court did not find that the bank had attempted to falsify or backdate its records as to when it had effectuated its setoff. The bank's failure to comply with the midnight deadline, in the circumstances of this case, was therefore no more than a technical violation of § 52-367a.

The bank's notices, in substance, were not immoral, unethical, oppressive or unscrupulous. The bank's technical violation of § 52-367a and the lack of explanation in its concomitant notice did not offend public policy, implicate the concept of unfairness or cause the type

of substantial injury that CUTPA was designed to address. *Cheshire Mortgage Service, Inc.* v. *Montes,* supra, 223 Conn. 105–106; see *Hinchliffe* v. *American Motors Corp.,* supra, 184 Conn. 617 n.7. We conclude, therefore, that the trial court improperly determined that the bank's actions violated CUTPA.[34]

The judgment is affirmed with respect to the first and second counts of Josef's complaint. The judgment is reversed with respect to the third count of Josef's complaint and with respect to the supplemental judgment awarding attorney's fees to Josef, and the case is remanded to the trial court with direction to render judgment in favor of the bank on the third count and to deny Josef's claim for attorney's fees. The cross appeal is dismissed.

In this opinion the other justices concurred.

---

[34] Because we conclude that the bank did not violate CUTPA, Josef is unable to collect attorney's fees under the provisions of CUTPA. We therefore dismiss, on the ground of mootness, Josef's cross appeal, challenging the trial court's ruling that Josef was unable to recover anticipatory appellate attorney's fees.