[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The matter before the court in this action is the cross claim of the defendant Harrison Conference Center of Heritage Village, Inc. ("Harrison") against the co-defendant Bank of Boston Connecticut (the "Bank".) The claims of the plaintiff Triangulum Associates against Harrison have been separately resolved. Triangulum is the owner of an inn and conference center located in Southbury, Connecticut. Harrison operated the inn for Triangulum pursuant to a written agreement which Triangulum terminated. The agreement provided that Harrison would collect the accounts receivable of the inn and deposit them to a checking account at the Bank which will hereafter be referred to as the "Sweep Account" or the "Account". Both Triangulum and Harrison claimed to be entitled to the balance in the Sweep Account after Harrison's operation of the inn was terminated. These conflicting claims led to the filing of this action, which is in the nature of an interpleader.
Harrison's cross claim against the Bank arises out of an agreement between Harrison and the Bank concerning the Sweep Account. Harrison alleges that the Bank breached the agreement concerning the Sweep Account, that the Bank has been unjustly enriched with respect to the Account and that the Bank violated the Connecticut Unfair Trade Practices Act ("CUTPA"), General Statutes § 42-110a et seq. with respect to the Account. In addition to denying the material allegations of the cross claim, the Bank filed several special defenses.
All of Harrison's claims against the Bank arise out of the facts as hereafter set forth, most of which are not in dispute. On January 31, 1988, the Bank and Harrison entered into a written agreement with respect to the Sweep Account which is entitled "Master Repurchase Agreement" (the "Agreement".) Pursuant to the Agreement, the Account was operated as a "Sweep" account, meaning that at the end of each business day, most of the funds in the Account were removed (or "swept") from the Account and were used to purchase overnight investments. On the next morning, the investments were repurchased by the Bank and the proceeds from CT Page 5149-AA the sale of the investments, including income earned, were restored to the Account. A Sweep Account is a recognized vehicle through which funds in a commercial checking account can earn income. The Agreement specifically provided that both Harrison and the Bank could terminate the Agreement at anytime on written notice to the other party.
This interpleader action was filed when Triangulum terminated its agreement with Harrison with respect to operation of the inn and Triangulum and Harrison both made claim to the balance in the Account. At the outset of this action, Triangulum sought and received a three-part ex parte temporary restraining order. The first part of the order enjoined Harrison from withdrawing or removing any funds from the Sweep Account. The second part, which was specifically addressed to the Bank, ordered the Bank "not to honor any transfer requests with respect to the Account, or checks drawn on the Account, except upon joint written authorization of Harrison and Triangulum . . ." The final part of the order directed both Harrison and Triangulum to deposit in the Account the proceeds from the collection of any accounts receivable for the inn as of December 9, 1990. The restraining order was first entered on December 10, 1990. In order to ensure compliance with the restraining order, the Bank put a "hold" on the Account.
The court later held a hearing as to whether the temporary restraining order should be continued in the form of a temporary injunction. After the hearing, on January 10, 1991, the court entered a temporary injunction which was identical to the temporary restraining order. The court stated on the record that the purpose of the order was to preserve the funds in the Account until such time as the court could decide the competing claims to the Account made by Harrison and Triangulum. The "hold" on the Account continued after the entry of the temporary injunction, with the result that any attempted withdrawals from the Account had to be handled manually by an officer of the Bank. A Bank officer had to authorize both the payment of checks where agreed upon by both Harrison and Triangulum and also the daily overdraft which took place as a result of the "sweep". The "hold" on the Account operates by showing a zero balance in the Account. The nightly sweep of funds from the Account therefore appeared as an overdraft on the Account, which required special approval by an officer of the Bank on a daily basis. In July, 1991, when the regular officer handling the Account was on vacation, the daily administration of the Account was handled by a more senior CT Page 5149-BB officer of the Bank, David Ray. Ray learned that the time required each day for the special handling of the Account was twenty to thirty minutes, contrary to a customary sweep account, where the transactions are automatically entered by computer. He also learned of the terms of the temporary injunction, which prohibited the Bank from honoring transfers from the Account without the joint written authorization of Harrison and Triangulum. Ray became concerned that the nightly "sweep" of the Account constituted an unauthorized transfer of funds out of the Account in violation of the temporary injunction. He spoke with in-house counsel for the Bank, who shared his concern about violating the temporary injunction. As a result, the Bank decided to exercise its right under the Agreement to terminate the agreement on written notice to Harrison. The fact that the Account now required time consuming special handling also contributed to the Bank's decision to terminate the Agreement. Notice of termination was given by a letter dated July 10, 1991. As of July, 1991 there was a balance of approximately $811,000 in the Account.
Harrison vehemently disputed the Bank's termination of the Agreement. Through its counsel, Harrison repeatedly demanded that the Bank reinstate the Agreement; the Bank refused. The Bank advised Harrison that it was agreeable to transferring the Account funds to a certificate of deposit or other account which would earn interest at a higher rate of return than the Sweep Account, but many months passed before Harrison finalized arrangements to transfer the funds to a new account.
In August, 1991, Harrison filed two motions with the court to address the termination of the "sweep". Neither motion was ever heard by the court. Harrison also negotiated with Triangulum to reach an agreement about the Account. In November, 1992 counsel for Triangulum agreed with Harrison to invest the funds from the Sweep Account in a commercial money market savings account, which was opened on January 26, 1993. Harrison seeks judgment on its cross claim against the Bank for $38,000, which both parties stipulated is the amount of income which would have been earned by the Sweep Account if the Agreement had not been terminated by the Bank in July, 1991.
In the first count of its cross claim against the Bank, Harrison alleges that the Bank breached the Agreement when it unilaterally terminated the Agreement in July, 1991. The allegations of this count do not specify which particular CT Page 5149-CC provision of the Agreement was allegedly breached. Harrison's post trial memorandum is only somewhat more helpful in this respect. Harrison contends in its memorandum that the temporary restraining order and temporary injunction prohibited Harrison from unilaterally removing the funds from the Sweep Account once the Bank terminated the Agreement. The court agrees that the temporary injunction did have that effect. Harrison then asserts the following:
 The court's order effectively removed the unilateral right of termination of the sweep agreement from both
Harrison and the Bank. Thereafter, when the Bank terminated the sweep agreement without cause, the Bank breached the agreement by doing so.
Harrison makes this significant claim without citing any law or legal precedent in support of it and without any explanation as to how the restraining order/temporary injunction caused a modification of the Bank's right to terminate the Agreement. Clearly, the express wording of the temporary injunction did not restrict the Bank's right to terminate the Agreement.
The Agreement gave both the Bank and Harrison the right to cancel the Agreement without explanation or cause, solely upon giving written notice to the other party. Paragraph 16 further provides that the Agreement could not be modified except by a written instrument signed by both parties. The Agreement did not impose any obligation on the Bank to invest the funds in the Account after termination of the Agreement. The court finds no merit to Harrison's unsupported contention that the Bank breached the Agreement by exercising its express right to terminate the Agreement. The court finds for the Bank on the first count of the counterclaim.
In the second count of its cross claim Harrison contends that the Bank was unjustly enriched as a result of its termination of the Agreement in that the Bank failed to pay income to Harrison on the Sweep Account from July 10, 1991 until January 29, 1993 despite the fact that the Bank had the use of the funds in the Account during that period of time. The Bank does not contest that it received some benefit by having the use of the funds in the Account to loan to customers of the Bank without the Bank paying Harrison any interest or income on the Account. The issue for the court is whether this situation constitutes an appropriate one for application of the doctrine of unjust CT Page 5149-DD enrichment.
Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. Hartford Whalers Hockey Club v. Uniroyal Goodrich TireCo., 231 Conn. 276, 283 (1994). The doctrine of unjust enrichment is an equitable one, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.Connecticut National Bank v. Chapman, 153 Conn. 393, 399 (1966). The test is what is just or equitable under a given set of circumstances, Hartford Whalers Hockey Club v. Uniroyal GoodrichTire Co., supra, 282, or whether someone obtained something of value to which he was not entitled to the detriment of someone else. Connecticut National Bank v. Chapman, supra.
The existence of a contract enforceable at law precludes the equitable remedy of unjust enrichment. U.S. Fidelity GuarantyCo. v. Metropolitan Property Liability Ins. Co., 10 Conn. App. 125,127, cert. denied, 203 Conn. 806 (1987). This is so "at least in the absence of a breach of the contract by the defendant . . ." Feng v. Dart Hill Realty, Inc., 26 Conn. App. 380, cert. denied, 223 Conn. 912 (1992). In 1988 Harrison and the Bank entered into the Agreement, which controlled the income-producing aspect of Harrison's checking account. Harrison's inability to recover on the Agreement results from the fact that it has not shown that the Bank breached any of the express terms of the Agreement. Harrison has not claimed that the Agreement itself is unenforceable. The Agreement is enforceable and as a result it precludes the availability of relief under the equitable doctrine of unjust enrichment.
Even if the doctrine of unjust enrichment were applicable, however, the court would not find that the facts here are such that justice requires that compensation be given to Harrison. There are several reasons for this conclusion. First, it is undisputed that the Bank is prohibited by provisions of federal and state law from paying interest on commercial checking accounts. 12 U.S.C. § 1832; 12 C.F.R. Part 329.1-2; General Statutes § 36a-299. The definition of "interest" under applicable federal law is very broad. Interest means "any payment to or for the account of any depositor as compensation for the use of funds constituting a deposit." 12 C.F.R. Part 329.1(c). Any award of damages to Harrison on these facts would clearly be CT Page 5149-EE in violation of state and federal law and the public policy underlying these statutes; it could not therefore be said to be required by justice.
Secondly, the court finds that the Bank's termination of the Agreement was reasonable under the circumstances. The Bank was properly concerned that the "Sweep" aspect of the Account might violate the temporary injunction. The "Sweep" required the nightly transfer of funds out of the Account at a time when the temporary injunction prohibited the Bank from honoring transfers except when jointly authorized by Harrison and Triangulum. In addition, the Bank, which was financially troubled at the time, also was legitimately concerned about the administrative burden of handling the Account, which required twenty to thirty minutes of an officer's time and judgment on a daily basis.
Finally, these facts do not show that the Bank obtained something to which it was not entitled. The Bank had the right under the Agreement to terminate the Sweep at any time without cause. The Agreement did not impose any obligation on the Bank after termination with respect to the funds in the Account. The Bank did not decide to terminate the Sweep with the intention of holding the funds in the Account hostage because of the temporary injunction; the Bank, in fact, urged Harrison to close the Account and transfer the funds to a different bank. The court finds no merit to Harrison's claim of unjust enrichment and finds for the Bank on the second count of the cross claim.
The third count of the cross claim sets forth Harrison's CUTPA claim. General Statutes § 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." It is established now that CUTPA applies to banks.Normand Josef Enterprises, Inc. v. Connecticut National Bank,230 Conn. 486, 493 (1994). Our Supreme Court has adopted the so-called "cigarette rule" used by the Federal Trade Commission to determine whether an act or practice is unfair within the meaning of CUTPA. Normand Josef Enterprises, Inc. v. Connecticut NationalBank, supra, 522. The rule requires an evaluation of three considerations: (1) whether the practice offends public policy as established in statutes or common law; (2) whether it is "immoral, unethical, oppressive or unscrupulous;" (3) whether it causes substantial injury to consumers, competitors or others engaged in business. Id. It is not necessary that all three criteria be satisfied. "A practice may be unfair because of the CT Page 5149-FF degree to which it meets one of the criteria or because to a lesser extent it meets all three." Cheshire Mortgage Service,Inc. v. Montes, 223 Conn. 80, 106 (1992). (Citations and internal quotation marks omitted.)
Harrison contends that the Bank's conduct was a violation of public policy, unethical and unfair. With respect to a public policy violation, the first criterion under the "cigarette rule," the test is whether the conduct in question violates public policy "as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness. . .". Conaway v. Prestia, 191 Conn. 484,492-3 (1983). (Internal quotation marks omitted.) Harrison fails to cite any statute, any common law case or any other "established concept of unfairness . . .," Id., which was offended by the Bank's exercise of its right to terminate the Agreement. Harrison fails to explain or elucidate in any way its assertion that the Bank acted unethically in terminating the Agreement. It cites no statute, regulation or industry standard of an ethical nature which was implicated by the Bank's action.
Harrison does develop its contention that the Bank acted unfairly in terminating the Agreement. Harrison argues that the temporary injunction removed Harrison's sole control over the Account and imposed the condition that funds could be withdrawn from the Account by Agreement of Harrison and Triangulum, thus forcing Harrison to obtain Triangulum's approval before the funds in the Account could be removed. These facts are accurate, but incomplete. Harrison then contends that in terminating the Agreement the Bank "unfairly exercised its position of strength to its benefit and Harrison's loss."
To find unfairness within the meaning of CUTPA, three tests must be satisfied. The injury must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that the consumer could not reasonably have avoided. A-G Foods,Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 216 (1990). The facts before the court fail to satisfy the third test. Harrison could have avoided the injury of the lost income from the Sweep Account by obtaining a modification of the temporary injunction. The restraining order and temporary injunction were both effective "until further order of this court . . ." Harrison began the process of seeking a modification of the temporary CT Page 5149-GG injunction when it filed a motion for authorization to close the Account and invest the funds elsewhere. The motion was filed with the court in August, 1991, only one month after the Bank terminated the Agreement, but it was never at any time brought on for a hearing. Harrison could have reasonably avoided the loss of income from the funds in the Account by obtaining a hearing on its August, 1991 motion or by filing such additional motions as might be necessary to bring the issue before the court. Because the injury could have reasonably been avoided by Harrison, the court finds that the Bank did not act unfairly in terminating the Agreement. The court finds no merit to Harrison's CUTPA claim and finds for the Bank on the second count of the cross claim. In light of the findings of the court, it is not necessary to address the Bank's special defenses.
Judgment is entered for the cross claim defendant Bank of Boston Connecticut on the cross claim of Harrison Conference Center of Heritage Village, Inc., with costs.
VERTEFEUILLE, J.