[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs Norman and Cheryl Fournier purchased their single family home known as 5 Margaret Terrace, Wolcott, from the defendant GAMA Developers, Inc. GAMA built the house for the plaintiffs pursuant to a written contract which warranted that the home would meet all building code requirements. Soon after closing the purchase of their home the plaintiffs found their basement flooded with water. They have continued to experience additional episodes of basement flooding and have also discovered other alleged defects in the construction. This suit is brought against GAMA for breach of contract, breach of the New Home Warranties Act, General Statutes § 47-116 et seq., and violation of Connecticut's Unfair Trade Practices Act ("CUTPA"), General Statutes § 42-110a et seq. CT Page 7910
The defendant Steven Docchio, doing business as Choice Landscaping Service, entered into a contract with the plaintiffs to remedy the drainage problems at the home by installing footing drains. Docchio warranted that his work would prevent any water problems at the house for a period of one year. The basement flooding continued after Docchio's drainage work, however, and the plaintiffs sue Docchio for breach of contract, breach of express warranty, breach of implied warranty, unjust enrichment, violations of the Connecticut Home Improvement Act, General Statutes § 20-418 et seq., and violation of CUTPA.
With respect to the plaintiffs' claims, the court finds the facts as hereafter set forth. On February 10, 1993 the plaintiffs and GAMA entered into a written contract for the construction and purchase of a single family home. Paragraph 11(b) of the contract provided, "[t]he plumbing, electrical and heating systems and all other systems included and installed in said dwelling by Seller hereunder shall meet the requirements of the Building Code of the State of Connecticut and will be in proper operating condition at the time of closing and will be suitable for reasonable domestic use."
The closing of the sale of the house occurred on March 4, 1993. Only one month later, in April, 1994, the plaintiffs found that the basement of their new home was flooded with water which covered approximately three-quarters of the basement floor. Using a wet vacuum and a sump pump, the plaintiffs managed to keep the depth of the water from rising above one inch. The plaintiffs notified GAMA of the flooding problem and the two principals of GAMA, Ronald Gambino and Louis Mazzeo, came to the property, but never entered the house to examine the problem nor took action to prevent its recurrence. The flooding lasted for several months.
The basement flooded again in similar fashion in February, 1994 and the flooding continued into March with isolated recurrences in April. Mrs. Fournier called Gambino, her cousin, when the flooding recurred in February, but Gambino did not come to inspect the situation. In April Mrs. Fournier called the Wolcott Building Inspector. As a result of that call, Gambino and Mazzeo came to the property. They told Mrs. Fournier that installation of a sump pump would solve the flooding problem and they would install the pump at their expense if the plaintiffs would purchase the pump. The plaintiffs declined this offer.
After experiencing continued episodic basement flooding, the CT Page 7911 plaintiffs met with Docchio in September, 1994. Docchio was confident that he could fix the flooding problem and represented that he was a licensed contractor. The plaintiffs' contract with Docchio called for him to install footing drains along two sides of the house and connect the drainage system to a dry well which he would install. The contract price was $5080 and Docchio warranted the work to be free from any problems in the area where he would install the drains for a period of one year. The dry well was located uphill from the septic system on the plaintiffs' property and Docchio represented that he had verbal approval of his drainage plan from the Chesprocott Health District. The plaintiffs paid Docchio in full, but later received a letter from Chesprocott stating that the dry well must be removed. The dry well is still in use at the property despite repeated efforts by the plaintiffs to reach Docchio to have him remove it. The plaintiffs also later learned that Docchio was not a licensed home improvement contractor despite his representations to the contrary. In the spring of 1995 the plaintiffs' basement flooded once again, although somewhat more slowly than in prior years. Each spring now the plaintiffs' basement floods in the same fashion and remains flooded for several weeks until it dries out.
The first count of the plaintiffs' complaint alleges that GAMA breached its contract because of the repeated flooding of the basement. Paragraph 11(b) of the agreement provided that all of the systems installed in the house would meet the requirements of the state building code. The plaintiffs' engineering expert, Richard Marnicki, testified that at the time of the construction of the plaintiffs' home, the state building code was comprised of both the so-called "CABO," a Connecticut code, and "BOCA," a national building code. The code sets forth the minimum requirements for construction and is intended to prevent any water infiltration of basements. GAMA's expert, the Wolcott Building Inspector, agreed that the objective of the building code is to have no water in a basement.
Section 1224.2 of BOCA, entitled "Ground water table investigation," requires a subsurface soil investigation "to determine the possibility of the ground water table rising above the proposed elevation of the floor or floors below grade." Section 1224.4 states that where the required ground water investigation "indicates that a hydrostatic pressure condition exists, walls and floors shall be waterproofed in accordance with this section." Sections 1224.4.1 and 1224.4.2 require that floors and walls be constructed "to withstand the hydrostatic CT Page 7912 pressure . . . to which they will be subjected."
There is no dispute that GAMA did not undertake the sub-surface soil investigation required under Section 1224.2. GAMA failed to do the investigation despite notice that there was in fact a high water table at the property. GAMA had arranged to have a specially engineered septic system prepared for the property. This special engineering was required by Chesprocott Health District because of the high water table at the site. Moreover, the land on the plaintiffs' lot to the rear of the house is composed of wetlands. A high water table, testified Marnicki, is (or should be) a red flag to a builder. Ignoring the existence of a high water table at the property, GAMA failed to take such steps as were necessary and required under the building code to assure that the basement would resist the hydrostatic pressure and be waterproof.
The principals of GAMA acknowledged in their testimony at trial that they had seen water infiltration of the plaintiffs' basement. They dispute the extent of the flooding, however, contending that the flooding only affects an area of the basement floor approximately 8' by 10' or 10' by 10'. Their testimony was refuted by actual photographs of the flooding which show substantial portions of the basement floor covered by water. The principal difference between the parties is the appropriate remedy to the flooding problem.
The court finds that GAMA breached its contract with the plaintiffs by its failure to investigate the ground water table at the site as required by the building code and by its failure to construct the basement and the drainage system so that they would resist hydrostatic pressure as required by the building code.
The proper measure of damages for breach of a construction contract is the cost of completion or correction by a third party. Brookfield v. Greenridge, Inc., 177 Conn. 527, 537
(1979). Marnicki testified that two types of drainage would be required at the property to ensure that there would be no water infiltration because water was infiltrating the basement from two areas: (1) between the slab (the cellar floor) and the basement walls and (2) from cracks in the basement floor because of the hydrostatic pressure. He therefore recommended first, with respect to a perimeter drain system, that the perimeter of the foundation of the home be excavated and a new perimeter drain CT Page 7913 system be installed, including application of a membrane and protection board to the foundation walls, sealing of the joint between the footing and the walls and then backfiling with gravel. He further recommended the installation of a secondary drain under the slab in order to accommodate the ground water which is creating pressure under the basement slab. This installation would require the removal of the existing slab, installation of a series of cross drains and installation of a new slab.
Because Marnicki does not do cost estimating, the plaintiffs called an additional witness, Robert Mango, a certified teacher of architectural design and drafting with twenty-five years experience in the construction business, to estimate the cost of the drainage systems recommended by Marnicki. Mango testified that installation of Marnicki's two-step plan would cost a total of $29,970.15, $16,543.90 for the perimeter drain system and $13,426.25 for the drainage system under the slab. He further testified that in his opinion installation of these systems would conclusively resolve the flooding problem.
GAMA contests the need for such an expensive system and instead proposes, once again, that the problem be resolved with a sump pump. GAMA's expert, the Wolcott building inspector, testified that installation of a sump pump below the footing was "a solution." Both of the plaintiffs' experts, however, testified adversely to the use of a sump pump. Marnicki testified that a sump pump is powered by electricity and therefore becomes inoperable in the event of a power failure. Also, a sump pump, like all machines, fails and needs replacement when the motor burns out. Most importantly, however, he testified, a sump pump is viable only if the material below the slab will relieve the hydrostatic pressure and he questioned whether this slab could do so given the fact that he saw water coming in through cracks in the slab floor. Mango testified that a sump pump "might" remedy the problem, but: (1) the water has to be brought to the pump to be pumped out, so it usually requires additional interior drainage to bring the water to a pit; (2) the pump will not operate in the event of a power outage and a heavy rain storm brings a higher risk of basement flooding along with a higher risk of a power outage; and (3) because the pump would be discharging into the wetlands at the rear of the property, a permit might be required. He stated that he would not build a house with a sump pump as part of the design. The court credits the testimony of Marnicki and Mango and finds that a sump pump is CT Page 7914 not a recommended solution to the flooding problem.
The court recognizes that the damages which the plaintiffs are seeking are significant in amount. However, all of these damages are directly attributable to GAMA's breach of its contract with the plaintiffs and are made necessary by the fact that now that the plaintiffs' home is complete, the cost of installing an appropriate drainage system is substantially higher because of the need to remove the current system. For example, installation of the sub-slab drainage will require disconnecting, removing and storing existing mechanical systems, such as the furnace and water heater, at a cost of $3162.50. Removing and discarding the existing basement slab will cost $4772.50. The court finds that the reasonable and necessary expense of installing a drainage system for a dry basement in compliance with the building code is $29,970.15.
Marnicki also testified to other deficiencies in the construction of the plaintiffs' home which are unrelated to the basement flooding. He found that the roof of the home is sagging, but did not identify the cause, stating that all of the "loads" need to be analyzed to determine the cause of the sagging. He did not identify any building code violation with respect to the roof nor was there evidence that this problem arose prior to the expiration of the one-year implied warranties under the Home Improvement Act. General Statutes § 47-118 (e). The plaintiffs therefore failed to establish GAMA's liability for this problem.
Marnicki testified that the handrails for the stairs to the deck in the rear of the home were in violation of the building code, but there was no evidence as to the cost to repair the deficiency. In similar fashion, Marnicki testified to other relatively minor code violations, but there was no evidence of the cost of repair. A plaintiff seeking money damages must present evidence which affords the court a reasonable basis for estimating his or her loss. Expressway Associates II v. FriendlyIce Cream Corporation of Connecticut, 218 Conn. 474, 476-7
(1991). Mango testified that the deck needed additional supports, but he did not identify this problem as a code violation. Also, there was no evidence that this problem arose prior to the expiration of the one-year implied warranties under the Home Improvement Act. General Statutes § 47-118 (e). (Marnicki inspected the property in 1995, two years after it was completed. Mango inspected it in 1996.) The plaintiffs failed to meet their burden of proof with respect to any deficiencies other than the CT Page 7915 flooding problem.
Judgment is entered on the first count of the complaint in favor of the plaintiffs against GAMA for damages of $29,970.15. The second count of the complaint alleges that the construction deficiencies constitute a breach of the statutory warranties under the New Home Warranties Act, General Statutes § 47-116 et seq. As stated above, the plaintiffs failed to meet their burden of proof under the Act with respect to the deficiencies other than the flooding problem. They also failed to establish the flooding as a breach of the statutory implied warranties. General Statutes § 47-118 (a) provides for implied warranties that the home will be: (1) free from faulty materials; (2) constructed according to sound engineering standards; (3) constructed in a workmanlike manner; and (4) fit for habitation. The plaintiffs did not present any testimony that the basement flooding was caused by faulty materials, that the drainage system was not constructed according to sound engineering standards or in a workmanlike manner or that the home unfit for habitation. Accordingly, judgment is entered for GAMA on the second count of the complaint.
In the third count the plaintiffs allege that GAMA's failure to remedy the construction deficiencies in the home constitutes an unfair or deceptive act or practice in violation of CUTPA. "The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, and whether a practice is unfair depends on the finding of a violation of an identifiable public policy." Krawiec v. Blake Manor DevelopmentCorp., 26 Conn. App. 601, 607 (1992). Our Supreme Court has adopted the so-called "cigarette rule" used by the Federal Trade Commission to determine whether an act or practice is unfair within the meaning of CUTPA. Normand Josef Enterprises, Inc. v.Connecticut National Bank, 230 Conn. 486, 522 (1994). The rule requires an evaluation of three considerations: (1) whether the act or practice offends public policy as established in statutes or common law; (2) whether it is "immoral, unethical, oppressive or unscrupulous;" and (3) whether it causes substantial injury to consumers, competitors or others engaged in business. Id. It is not necessary that all three criteria be satisfied. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 106
(1992). (Citations and internal quotation marks omitted.) CT Page 7916
In their post trial brief, the plaintiffs contend that it is GAMA's breach of the New Home Warranties Act, General Statutes §47-116 et seq. which forms the basis for the plaintiffs' claim of a CUTPA violation. The Appellate Court has held that a breach of the Home Warranties Act can be found to be a CUTPA violation.Krawiec v. Blake Manor Development Corp., supra,26 Conn. App. 608. This court, however, has found that the plaintiffs failed to sustain their burden of proof with respect to their claims under the Act. The court found for the plaintiffs only on their breach of contract count. The plaintiffs did not brief the issue of whether a breach of the construction contract or a failure to remedy construction deficiencies can constitute a CUTPA violation. The issue before the court is whether GAMA's failure to correct the flooding problem meets the requirements of the cigarette rule. GAMA, in its post trial brief, contends that it does not.
GAMA's failure to remedy the flooding problem in the plaintiffs' home does not appear to offend any public policy as established in a statute or in the common law. The court is unable to identify a statute or common law principle which is implicated by GAMA's conduct. Nor does the court find that GAMA's conduct in failing to remedy the problem is "immoral, unethical, oppressive or unscrupulous." Certainly, the attitude of Gambino and Mazzeo, the principals of GAMA, toward correcting the flooding problem was poor, but they did not promise to repair and later renege nor did they misrepresent their intention to repair in order to induce the plaintiffs to make payment or forego other remedies which they might have. See, e.g., Amato v. SherwoodForest, Inc., 15 Conn. L. Rptr. No. 3, 69 (October 23, 1995.)
With respect to the third element of the cigarette rule, the court finds that GAMA's failure to repair did not cause substantial injury to consumers. Fortunately, the plaintiffs did not incur damage to or loss of any of their personal property in the basement, primarily because of their diligence in using a water vacuum and sump pump to limit the flooding. Although the recurring flooding has been very inconvenient for the plaintiffs, it has not caused them substantial injury. Through application of the cigarette rule, therefore, the court finds that GAMA's failure to remedy the basement flooding was not an unfair act within the meaning of CUTPA. Judgment is entered for GAMA on the third count of the complaint. (The court notes that even if the plaintiffs had established their claim under the Home Warranties Act, that claim likely would not have been found to be a CUTPA CT Page 7917 violation under the cigarette rule.)
The remaining seven counts of the complaint are directed to the defendant Steven Docchio d/b/a Choice Landscaping Service. As the facts set forth above clearly show, Docchio was not a registered home improvement contractor at the time he entered into his contract with the plaintiffs in the fall of 1994. Docchio's registration had expired on June 1, 1994. Docchio's offering to make a home improvement to the plaintiffs' property at a time when he was not registered constitutes a violation of the Home Improvement Act, General Statutes § 20-427 (b)(5). Docchio further violated the Home Improvement Act in that the contract he entered into with the plaintiffs was undated; it failed to state the starting and completion dates for the work and he entered into the contract despite the fact that he was not a registered contractor. General Statutes §§ 20-429 (a)(4), (7) and (8).
Pursuant to General Statutes § 20-429 (a), Docchio's contract is not valid or enforceable against the plaintiffs because of the numerous violations of the Home Improvement Act. The plaintiffs are therefore entitled to the return of the contract price, $5080., which they had paid Docchio in full. Judgment is entered for the plaintiffs against Docchio on the tenth count of the plaintiffs' complaint for damages of $5080. plus statutory interest from October 11, 1994.
In the ninth count of the plaintiffs' complaint, they allege that Docchio's actions constituted a violation of CUTPA. Any violation of the Home Improvement Act constitutes a per se violation of CUTPA by virtue of General Statutes § 20-427 (c). Under CUTPA, the plaintiffs seek an award of punitive damages, General Statutes § 42-110g(a), and attorney's fees, General Statutes § 42-110g(d). Awards of punitive damages and attorney's fees under CUTPA are discretionary with the court. Gargano v.Heyman, 203 Conn. 616, 622 (1987). An award of punitive damages must be based on an intentional and wanton violation of the rights of others or on reckless indifference to those rights. Id.
The facts here clearly demonstrate that Docchio acted with a reckless indifference to the plaintiffs' rights. Knowing that he was not a registered home improvement contractor because his registration had expired months earlier, he nevertheless told the plaintiffs that he was registered and employed a contract which was not in compliance with the Act. The plaintiffs are entitled to an award of punitive damages, the amount of which shall be CT Page 7918 addressed at a supplemental hearing to be held on Thursday, August 14, 1997 at 10:00 a.m. At the outset of trial, the parties agreed with the court's suggestion to defer the amount of any punitive damages or attorneys' fees to be awarded until there was a ruling on the merits of the case.
The court further finds that the plaintiffs are entitled to an award of attorneys' fees under CUTPA. With respect to the amount to be awarded, Connecticut General Statutes § 42-110g(d) provides that the court may award reasonable attorneys' fees "based on the work reasonably performed by an attorney and not on the amount of recovery." The Appellate Court has indicated thatJohnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719
(5th Cir. 1974) sets forth the factors to be considered by the trial court in determining the amount of attorneys' fees to be awarded under CUTPA. Hernandez v. Monterey Village AssociatesLimited Partnership, 24 Conn. App. 517, n. 1 (1991). It should be further noted that the attorney's fees to be awarded will be limited to the fees incurred in making the CUTPA claim against Docchio only. The plaintiffs did not sustain their CUTPA claim against GAMA and cannot be awarded any attorney's fees for their claims against GAMA. The amount of attorney's fees to be awarded will also be heard at the August 14 hearing.
The court having found in plaintiffs' favor on the ninth and tenth counts of the plaintiffs' complaint, it is not necessary to consider the remaining counts, which would be duplicative.
VERTEFEUILLE, J.