DECISION
Before the Court is the motion of defendants Fleet Bank (R.I.) N.A., Fleet Credit Card Services, L.P., Fleet Credit Card Holdings, Inc., and FleetBoston Financial Corporation (collectively "Fleet") to dismiss plaintiffs' first amended class action complaint. The gravamen of plaintiffs' complaint, filed on behalf of a putative nationwide class, is that Fleet engaged in an allegedly improper bait and switch scheme by inducing consumers, through national advertising, to transfer credit card balances to Fleet with promises of no annual fees and favorable interest rates and then switching the terms and imposing annual fees and high interest rates once those balances were transferred. In their complaint, plaintiffs assert causes of action for breach of contract (Count I) and violation of the Rhode Island Unfair and Deceptive Trade Practices Act, G.L. 1956 § 6-13.1-1 et seq. (the "Deceptive Trade Practices Act") (Count II).
Fleet seeks to dismiss plaintiffs' claims that Fleet violated Rhode Island's Deceptive Trade Practices Act on the grounds that banks are exempt from the Act as entities regulated under federal law and monitored by federal agencies. Fleet seeks to dismiss plaintiffs' breach of contract claims for lack of subject matter jurisdiction on the grounds that the amount in controversy, as to each plaintiff, is not in excess of the $5000 minimum amount necessary for Superior Court jurisdiction. Finally, Fleet seeks to dismiss plaintiffs' claims against defendants Fleet Credit Card Holdings, Inc. and FleetBoston Financial Corporation on the grounds that plaintiffs have failed to show any alleged wrongdoing on the part of these two corporate defendants.
For the reasons set forth in this decision, this Court denies Fleet's motion in its entirety.
 Factual Background and Procedural History
Plaintiffs filed their first amended class action complaint on November 20, 2000. The complaint alleges that Fleet executed a nationwide advertising campaign designed to lure consumers into transferring debt to Fleet credit card accounts through the "SmartMove Balance Transfer Service" plan.
According to plaintiffs, Fleet sent to prospective cardholders various promotional letters which advertised a fixed annual percentage rate (APR), usually 8.5% or lower, on balances transferred. Fleet expressly indicated, according to plaintiffs, that the fixed rate was not an introductory rate. The promotional letters in some instances also advertised that the cardholders' accounts would be maintained with "no annual fee." The so-called "switch," alleged by plaintiffs, occurred shortly after the cardholders had transferred their debts to Fleet, at which time Fleet raised the applicable APR and imposed annual fees.
According to Fleet, the bank took such action due to an increase in interest rates by the Federal Reserve Bank. Fleet contends it was well within its rights to change the terms of the 2 cardholders'agreements given the "change in terms" provision of those agreements. Under the terms of the cardholders' agreements, the accounts and the agreements themselves are "governed by Rhode Island law, subject to applicable provisions of federal law."
In their complaint, plaintiffs assert causes of action against Fleet for breach of contract and violation of the Rhode Island Unfair and Deceptive Trade Practices Act. They seek damages for breach of contract, including consequential and incidental damages. They also seek to recover similar damages for violation of the Deceptive Trade Practices Act, plus attorneys' fees. In addition, as to both causes of action, plaintiffs seek equitable relief, including an order that Fleet cease and desist all improper advertising, promotional and sales activities and practices as described in the complaint; an order enjoining Fleet from the promotion of their open-end credit plans through the use of deceptive and misleading advertising devices described in the complaint; restitution of all interest and fees paid by plaintiffs because of Fleet's alleged wrongful actions; and disgorgement by Fleet of all profits and compensation emanating from the use of false and deceptive advertising and all profits and compensation emanating from the unfair, unlawful or fraudulent business practices complained of in the complaint. All of the causes of action and the requests for relief stated in plaintiffs' complaint are asserted against all of the Fleet entities named as defendants in this action.
Fleet filed the subject motion to dismiss on December 11, 2000. On March 9, 2001, shortly before the scheduled hearing on Fleet's motion to dismiss, plaintiffs filed their motion for class certification. In their class certification motion, plaintiffs seek certification of a class of similarly situated persons, as alleged in their first amended class action complaint, including any person who transferred debt balances to a Fleet credit card account advertised by Fleet as a fixed interest rate or no annual fee account. Plaintiffs' class certification motion is pending and scheduled for hearing on May 9, 2001. On March 20, 2001, this Court entertained extensive oral argument with regard to Fleet's motion to dismiss. After a review of extensive memoranda filed by the parties both before and after the hearing of the motion, this decision follows.
 The Deceptive Trade Practices Act Claim
Fleet first argues that "[t]he Deceptive trade practices act [count] should be dismissed because defendants Fleet Bank (RI), N.A., Fleet Credit Card Services, L.P. and Fleet Credit Card Holdings, Inc. are regulated exclusively by the Office of the Comptroller of the Currency (OCC), and defendant FleetBoston Financial Corporation is regulated by the Federal Reserve Board." Accordingly, as regulated entities, Fleet contends that defendants' alleged conduct falls squarely within the exemption to the Deceptive Trade Practices Act set forth at R.I.G.L. § 6-13.1-4. While plaintiffs acknowledge that banks generally are subject to regulation by federal law and federal agencies, they argue that the exemption is inapplicable because the specific conduct of Fleet associated with its alleged bait and switch scheme is not subject to federal regulation.
The pertinent provisions of the Deceptive Trade Practices Act state as follows:
 Section 6-13.1-2 "Unlawful Acts or Practices" "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."
 Section 6-13.1-3 "Interpretation" "It is the intent of the legislature that in construing §§ 6-13.1-1 and 6-13.1-2 of this chapter due consideration and great weight shall be given to the interpretations of the federal trade commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended."
 Section 6-13.1-4 "Exemptions"
 "Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States."
(Emphasis added.)
The plain language of the Deceptive Trade Practices Act would appear to exempt from the Act only actions or transactions that are "permitted" or allowed under state or federal law. In interpreting this language, however, the Rhode Island Supreme Court has given it a broader interpretation.
In State v. Piedmont Funding Corp., which involved claims of deceptive practices regarding the sale of life insurance and securities, the Supreme Court indicated that "the legislature clearly exempted from the Act all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers." 119 R.I. 695, 699, 382 A.2d 819, 822 (1978). The Court expressly rejected the State's argument in that case that the exemption applies only where "the regulating agency has established that the manner in which the transaction was conducted is a proper way of doing business." 119 R.I. at 698-699, 382 A.2d at 821. Similarly, in Doyle v. Chihoski, 433 A.2d 1243 (R.I. 1982), our Supreme Court stated that "the Deceptive Trade Practices Act does not apply to any transactions or actions that are subject to the supervision of either Rhode Island's Department of Business Regulation or some federal regulatory body or official." 443 A.2d at 1244. Most recently, the Supreme Court determined, pursuant to the exemption embodied in §6-13.1-4, that a specific state statute regulating the conduct at issue "preempted" a claim by plaintiff under the Deceptive Trade Practices Act. Kelly v. Cowesett Hills Associates, No. 99-419-A, Slip. Op. at 5 (R.I., filed March 30, 2001) (finding that the Asbestos Abatement Act "preempted" plaintiff's claim for improper asbestos abatement under the Deceptive Trade Practices Act).
In Piedmont Funding, Doyle and Kelly, the fact that the businesses and their general activity in question were regulated or "subject to monitoring" by governmental agencies was dispositive of the issue of whether the exemption under § 6-13.1-4 of the Deceptive Trade Practices Act applied. There was no claim that the general activity in question was not so regulated. None of the parties opposing the exemption in those cases sought to claim, or then prove, that the specific acts at issue were not regulated. Those courts had no need to further inquire, therefore, as to whether the specific acts at issue were likewise subject to governmental regulation or monitoring. Cf. Perron v. Woonsocket,403 A.2d 252 (R.I. 1979) (although the Public Utilities Commission regulates the general activity of companies selling water to the public and has broad power to regulate the particular acts which constituted the alleged violation, the hookup agreement at issue involved nothing more than a private contract between the city and the plaintiffs such that the specific acts at issue of alleged violations of that agreement were not exempt from the Deceptive Trade Practices Act).[1]
In heavy reliance on the language from Piedmont Funding, Fleet argues in this case that its alleged conduct of bait and switch is exempt from the Deceptive Trade Practices Act because its banking business is "subject to monitoring" by federal regulatory agencies. The phrase "subject to monitoring," however, cannot be read in a vacuum. The Supreme Court also wrote in Piedmont Funding that
 "When a party claiming exemption from the Act shows that the general activity in question is regulated by a regulatory body or officer within the meaning of 6-13.1-4, the opposing party then has the burden of showing that the specific acts at issue are not covered by the exemption."119 R.I. at 700, 382 A.2d at 822.
The mere fact that a business is regulated or "subject to monitoring" by a governmental agency, therefore, is not sufficient, in and of itself, to exempt that business from the Act. That business must show that its general activity in question likewise is regulated by the governmental agency. If it meets its burden in that regard, the exemption may apply, but only if the opposing party fails to allege and then show that the "the specific acts at issue are not covered by the exemption." Id.
This Court's interpretation of the exemption in the Rhode Island Unfair and Deceptive Trade Practices Act and Piedmont Funding is supported by a decision of the federal district court in South Carolina that had occasion to interpret and apply Piedmont Funding to its consideration of a virtually identical exemption under South Carolina's deceptive trade practices act. In McTeer v. Provident Life and Accident Insurance,712 F. Supp. 512 (D. S.C. 1989), the Court applied the burden-shifting analysis set forth in Piedmont Funding and found that the exemption from the South Carolina Unfair and Deceptive Trade Practices Act for actions and transactions permitted under law administered by a regulatory body did not apply to computations of interest on early payments of mortgage loans, even though the mortgagor was a regulated insurance company. It reasoned that while the business of insurance generally is regulated by state law and while state law authorizes insurance companies to invest in mortgage loans, the mere authorization to engage in that activity could not amount to regulation of the general activity of mortgage loan investments. The Court then went on to find that, even assuming that the general activity of mortgage loans could be said to be regulated, the specific act at issue of the assessment of additional interest due to prepayment of the loans was not regulated either expressly or by implication under state law.
In the case at bar, it is undisputed between the parties that the Fleet defendants are banking entities whose business of banking generally is regulated by federal law and subject to monitoring by federal agencies. That fact alone, however, without more, is insufficient under Piedmont Funding and its progeny to trigger the exemption under § 6-13.1-4 of the Deceptive Trade Practices Act. See McTeer, supra, 712 F. Supp. at 516-517; see also Josef Enterprises v. Connecticut National Bank,646 A.2d 1289 (Conn. 1994) (the mere existence of generic state and federal banking regulations did not exclude coverage under the Connecticut Unfair Trade Practices Act). To apply the exemption in any case in which an entity is generally regulated would permit the exception to swallow the rule. Admittedly, banks are regulated by various federal authorities. However, "while banks are arguably comprehensively regulated under federal law, even national banks, which are instrumentalities of the federal government, have always been subject to the laws of the state in which they do business. State laws are preempted only when their operation expressly conflicts with the laws of the United States." See Josef, supra, 646 A.2d at 1304 (collecting cases which indicate that a majority of state courts have determined that banks are subject to the provisions of their state's unfair or deceptive trade practices or consumer protection statutes). It is undisputed in this case that the Deceptive Trade Practices Act is not preempted, as to any of Fleet's banking activities at issue in this litigation, by any provision of federal law. Indeed, Fleet concedes that no federal agency has the exclusive right to regulate its conduct in this area.
In determining the applicability of the exemption in this case, therefore, the question becomes not whether Fleet's banking activity is regulated generally under federal law, but whether the general or special activity of Fleet at issue in this case is regulated under federal law. Fleet carries the burden in the first instance, consonant with the teachings of Piedmont Funding, to show that the general banking activity at issue in this suit is federally regulated. If it satisfies its burden in this regard, then the burden shifts to the plaintiffs to show that the specific acts at issue are not regulated by federal law. Piedmont Funding, supra, 119 R.I. At 700, 382 A.2d at 822.
Fleet first argues that the OCC is fully authorized to pursue actions against national banks if they violate section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which is the key provision of the Act prohibiting unfair or deceptive acts or practices. The pertinent provision of the FTC Act, entitled "Unfair Methods of Competition Unlawful; Prevention by Commission," provides as follows:
 "(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade. (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.
 (2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 18(f)(3) * * * from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce. (emphasis added).
 * * *"
By its express terms, this provision of the FTC Act is inapplicable to banks. Indeed, it is well-settled under this Act that the Federal Trade Commission itself is not imbued with the power to prevent banks from engaging in unfair or deceptive trade practices. See Josef, supra, 646 A.2d at 1301 (although banks are not subject to the FTC, the banking industry is affected by FTC rules and regulations).
This is not to say, however, that the OCC is prevented from enforcing this provision against banks. In fact, Fleet correctly states that15 U.S.C. § 57(a)(f) authorizes the Division of Consumer Affairs of the OCC to enforce compliance with the FTC Act by national banks and their operating subsidiaries. However, 15 U.S.C. § 57(a)(f) makes it clear that the OCC as well as other federal agencies may enforce regulations prescribed under this provision of the FTC Act. The regulations that it may enforce are those promulgated by the Board of Governors of the Federal Reserve System. In this regard, the Act states "* * * [T]he Board of Governors of the Federal Reserve System (with respect to banks) * * * shall prescribe regulations defining with specificity such unfair and deceptive acts or practices, and containing requirements prescribed for the purposes of preventing such acts or practices." The Act goes on to state that "compliance with regulations prescribed under this subsection shall be enforced under section 8 of the Federal Deposit Insurance Act, 12 U.S.C.S § 1818, in the case of (A) national banks . . . by the division of consumer affairs established by the [OCC]; (B) member banks of the Federal Reserve System (other than national banks . . . and [certain organizations operating under certain provisions of the Federal Reserve Act) by the division of consumer affairs established by the Board of Governors of the Federal Reserve System; and (C) banks insured by the Federal Deposit Insurance Corporation, (other banks referred to in subparagraph (A) or (B)) . . . by the division of consumer affairs established by the Board of Directors of the Federal Deposit Insurance Corporation."
Under 12 U.S.C. § 1818(b)(1), entitled "Cease and Desist Proceedings,"
 "[i]f, in the opinion of the appropriate federal banking agency, any insured depository institution, depository institution which has insured deposits, or any institution affiliated party is engaging or has engaged, or the agency has reasonable cause to believe the depository institution or any institution affiliated party is about to engage in unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the institution or any institution affiliated party is about to violate, a law, rule, regulation * * * the agency may issue and serve upon the depository institution notice of charges in respect thereof."
From this statutory scheme, it is clear that the OCC and other federal agencies are granted the power to enforce certain federal regulations as against banks, inclusive of regulations governing unfair and deceptive acts or practices. Absent the promulgation of such regulations, however, those enforcement powers are hollow. While clearly the Board of Governors of the Federal Reserve System has been granted the power by Congress to prescribe regulations concerning unfair and deceptive acts or practices by banks, similar to regulations promulgated by the FTC, Fleet has been unable to provide the Court with any evidence that any such regulations have been adopted.
Mindful of the dearth of regulatory authority upon which its claimed exemption under the Deceptive Trade Practices Act depends, Fleet engages in federal statutory and regulatory obfuscation.
It argues to this Court, improperly, that the FDIC cease and desist provision allows the OCC and other federal agencies to enforce state law, inclusive of the Rhode Island Deceptive Trade Practices Act.
There is no legal authority to support its argument in this regard; indeed, the argument flies in the face of express language of the statutes in question which indicate that the OCC and other federal agencies may employ their powers under the cease and desist provision only to enforce the laws enacted by Congress and the regulations promulgated thereunder by the Board of Governors of the Federal Reserve System pursuant to the federal enabling legislation. The cease and desist provision, therefore, is not self-executing but is dependent upon an underlying violation of federal law or regulation.
In effect, Fleet is contending that the very state law from which it should be exempted should not be enforced by the state but may be enforced by the federal government so as to remove it at the state level from the applicability of that law. This circular reasoning seems to be in direct contradiction of § 6-13.1-3 of the Deceptive Trade Practices Act, entitled "Interpretation," which states that in interpreting the state law "due consideration and great weight shall be given to the interpretations of the federal trade commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))." Thus, Fleet urges this Court to give deference to a federal agency in interpreting and applying the same state law that it claims Rhode Island is powerless to enforce against it. Such a proposition seems contradictory to the entire purpose of the exemption under § 6-13.1-4 and, if accepted, would turn both state and federal law on their heads.
In an attempt to support its argument that the federal government may enforce state law, Fleet cites no legal authority but makes reference to a purported consent decree entered into between the OCC and Providian National Bank. In The Matter of Providian National Bank, Tilton, New Hampshire, No. 2000-53 (June 28, 2000). That decree states that the OCC intended to charge the subject bank with violations of state as well as federal law. With respect to this motion to dismiss, however, this Court deems it appropriate to confine its consideration to the pleadings and the applicable law. A consent decree, which is outside the pleadings, cannot properly be considered without explanation of the source and intent of its provisions. Moreover, a consent decree can recite whatever provisions the consenting parties agree to cite; it in no way reflects or has the force of law.
As such, Fleet has failed to meet its burden in showing that the exemption embodied in § 6-13.1-4 of the Deceptive Trade Practices Act bars plaintiffs' cause of action against it for violating that Act. It has not provided this Court with any authority to suggest that the federal government regulates the general banking activity that is the subject of plaintiffs' complaint. In particular, Fleet has failed to provide this Court with evidence of any federal law or regulation, applicable to banks, that governs the promotional and advertising practices of banks, the solicitation and transfer of credit card balances from one depository institution to another or the issuance and terms of credit cardholder agreements with consumers.
Moreover, Fleet has failed to adduce any evidence that the federal government has sought to regulate the specific bait and switch conduct alleged by plaintiffs. Fleet attempts to cast an FTC regulation, which was never adopted by the Board of Governors of the Federal Reserve System, as required by federal law, as a regulation that governs its specific conduct at issue and mandates application of the exemption. This regulation, embodied in 16 C.F.R. § 238.0, is entitled "Guides against bait advertising." Fleet states that this regulation was promulgated by the FTC pursuant to 15 U.S.C. § 57(a) and is enforceable by the FTC. However, as noted previously, 15 U.S.C. § 45
expressly exempts banks from FTC regulation. The ability to regulate and promulgate rules with regard to banks regarding unfair and deceptive practices comes under 15 U.S.C. § 57(a)(f), as was argued by Fleet. Under that provision, once the FTC proscribes a rule under15 U.S.C. § 57 (a)(1)(b), then "within 60 days after such rule takes effect each such Board shall promulgate substantially similar regulations prohibiting acts or practices of banks or savings and loan institutions * * * which are substantially similar to those prohibited by the Commission and which impose substantially similar requirements unless any such Board finds that such acts or practices of banks or savings and loan institutions * * * are not unfair or deceptive or that the Board of Governors of the Federal Reserve System finds that implementation of similar regulations with respect to banks, would seriously conflict with essential monetary and payments systems policies of such board."15 U.S.C. § 57(a)(f).
Fleet has not provided this Court with any regulation promulgated under this section or any evidence that bait and switch guides have been adopted, to be applicable to banks, under the framework of15 U.S.C. § 57(a)(f). The defendant Fleet Bank in the instant matter has simply failed to show this Court that its alleged bait and switch activity is regulated by any federal or state law or regulation.
It appears that the only federal law that arguably would govern the specific banking activity at issue in this case is the federal Truth In Lending Act (TILA). The TILA requires direct mail solicitations to disclose "any annual fee, other periodic fee or membership fee imposed for the issuance or availability of a credit card."15 U.S.C. § 1637(c)(1)(A)(ii)(I). In fact, in the federal court counterpart to this case, Rossman v. Fleet Bank (R.I.), 2000 WL 33119419 (Dec 29, 2000 Penn), the only federal cause of action asserted by plaintiffs was a violation of the TILA. The federal court dismissed that claim on the grounds that the TILA was inapplicable because Fleet complied with the notice requirements of the TILA, despite its alleged switching of the interest rates subsequent to the balance transfers. The Court in Rossman held that plaintiff failed to allege that Fleet engaged in conduct expressly prohibited by the TILA. The Court, however, did not foreclose the plaintiff's claims under state law. It stated "if, as alleged, Fleet lured consumers into opening credit card accounts with relatively favorable terms while intending to switch those terms shortly thereafter, then Fleet unquestionably engaged in wrongdoing.
The Court expresses no opinion as to whether plaintiffs' allegations state a cause of action under state law."
Absent evidence by Fleet that its general banking activities at issue here are regulated by federal law, it cannot sustain its burden to prove that its conduct is exempt from § 6-13.1-4 of the Deceptive Trade Practices Act. Even assuming that it could meet its burden in this regard, such that the burden would shift to plaintiffs to show that the specific bait and switch conduct at issue was not regulated by federal law, plaintiffs meet their burden because Fleet has failed as well to establish any regulation of alleged bait and switch practices by banks under federal law. Accordingly, this Court is of the view that the exemption is inapplicable and that there is no impediment to plaintiffs' Deceptive Trade Practices Act claims proceeding against Fleet in this Court. To rule otherwise, in the absence of any preemption by federal law or indication that any federal law or regulation would govern these claims, would be tantamount to deeming the Rhode Island Deceptive Trade Practices Act inapplicable to banks generally in a case where it appears that the very contracts at issue provided that Rhode Island law would apply. It potentially could leave plaintiffs without any forum in which to seek a remedy for Fleet's alleged unfair and deceptive conduct.
 Breach of Contract Claim
Fleet next claims that plaintiffs' breach of contract claims should be dismissed for lack of subject matter jurisdiction. Fleet contends that the plaintiffs have not satisfied the provision of G.L. 1956 § 8-2-14
which requires that the amount in controversy as to each plaintiff's claim exceed the $5,000 jurisdictional amount. In response, the plaintiffs contend that jurisdiction over their breach of contract claims exists under G.L. § 8-2-13 — "Exclusive jurisdiction of equity actions" which provides:
 "The superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character and of statutory proceedings following the course of equity * * *. If an action is brought in the superior court which represents an attempt in good faith to invoke the jurisdiction conferred by this section, the superior court shall have jurisdiction of all other actions arising out of the same transaction or occurrence, provided the other actions are joined with the action so brought or are subsequently made a part thereof under applicable procedural rules, and the court may retain jurisdiction over the other actions even though the initial action fails for want of equity jurisdiction."(Emphasis added.)
Fleet contends that the plaintiffs have "included a perfunctory request for injunctive relief * * * simply to manufacture jurisdiction that would not otherwise exist." Fleet's bald assertion that plaintiffs' injunctive relief claims are transparent and that it is simply a ruse to gain jurisdiction over their contract claims is unpersuasive.
This is not the first time our court has dealt with the equity jurisdiction issue. In Carvalho v. Coletta, 457 A.2d 614 (R.I. 1983), our Supreme Court dealt with a similar situation in which multiple claims arose in a single complaint. In Carvalho, plaintiff's complaint stated a claim for deprivation of personal property without due process of law and requested equitable relief in connection with that claim; by virtue of that claim, the entire complaint, inclusive of causes of action asserting claims for legal relief, came within the exclusive jurisdiction of the Superior Court. 457 A.2d at 617. Similarly, this Court believes that plaintiffs' claims for breach of contract, although essentially legal in nature, should fall within the exclusive jurisdiction of equity actions because the plaintiffs are seeking equitable relief, at a minimum, for violations of the Deceptive Trade Practices Act.[2] This Court must presume from the face of the pleadings, and in the absence of evidence to the contrary, that plaintiffs seek to invoke the equitable jurisdiction of this Court, even as to their contract claims, in good faith.
In addition, this Court finds further that Fleet cannot establish, from the face of the first amended complaint, that plaintiffs cannot satisfy the amount in controversy requirements of § 8-2-14.
In Carvalho v. Coletta, 457 A.2d 614, n. 3 (R.I. 1983), it was stated that the damages requested will not satisfy the jurisdictional amount where it appears with legal certainty that plaintiffs cannot recover the amount demanded. Applying that logic to the instant matter, it does not appear with "legal certainty" that plaintiffs cannot meet the jurisdictional amount required under § 8-2-14. Therefore, at this juncture of the litigation, dismissal of plaintiffs' breach of contract claims for lack of subject matter jurisdiction would be entirely inappropriate.
 Defendants to the Class Action
In their final argument, Fleet contends that FleetBoston Financial Corp. and Fleet Credit Card Holdings, Inc. should be dismissed as defendants from the lawsuit. Fleet asserts that plaintiffs have failed to show any wrongdoing by either FleetBoston, which is alleged in the complaint to be the bank holding company that is the ultimate corporate parent of all the Fleet defendants, or Fleet Credit Card Holdings, Inc., which is alleged to be the general partner of Fleet Credit Card Services, L.P. Plaintiffs respond that they have sufficiently alleged, in their complaint, several instances of misconduct by Fleet Credit Card Holdings, Inc. and FleetBoston which warrant their inclusion in the current litigation. They also have sought enforcement of certain remedies as against these entities.
Again, based on the face of the plaintiffs' complaint, this Court finds that plaintiffs have sufficiently alleged that both FleetBoston and Fleet Credit Card Holdings, Inc. are proper defendants in the current matter. This Court, at this stage of the proceedings, is required to assume the truth of the plaintiffs' allegations and resolve any doubts in favor of the plaintiffs. See Gaudreau v. Blasbalg, 618 A.2d 1272, 1274 (R.I. 1993). A dismissal of either of these corporate entities at this stage of the proceedings, therefore, would be inappropriate.
 Conclusion
For the reasons set forth in this decision, the motion to dismiss filed by the Fleet defendants is denied in its entirety. Counsel shall confer and submit to the Court forthwith for entry an agreed upon form of order reflective of this decision.
[1] As this case, like Perron, involves a contract dispute, it is arguable that the federal government would decline to exercise regulatory power over the dispute even assuming it possessed the power to regulate. Indeed, plaintiffs have suggested that in fact the OCC would not intervene in a private contract dispute. Like Perron, therefore, this type of dispute militates against operation of the exemption.
[2] It is interesting to note that R.I. G.L. § 6-13.1-52 reduces the requisite $5,000 (§ 8-2-14) jurisdictional amount relating to class certifications for claims arising under RIUTPA.